FILED

2004 APR 12 A 9: 38

U.S. DISTRICT COURT
BRIDGEPORT, CONN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH ATTIAS & HAIM ATTIAS | : CIVIL ACTION NO. |
| | : 3:03 CV 01009 (SRU) |
| VS. | : |
| | : |
| PATRONS MUTUAL INSURANCE | : |
| COMPANY OF CONNECTICUT | : APRIL 7, 2004 |

### DEFENDANT'S, PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT, MOTION FOR JOINDER OF SHLOMO AND DVORA ATTIAS AS NECESSARY PARTY PLAINTIFFS

Pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, the defendant, Patrons Mutual Insurance Company of Connecticut, hereby seeks an order requiring the plaintiffs to join Shlomo Attias and Dvora Attias as party plaintiffs in the above-referenced action. The defendant represents that Shlomo Attias and Dvora Attias, residents of Hollis Hills, New York, are the parents of the present plaintiffs, Joseph and Haim Attias, and are financial partners in the ownership of 475 New Britain Avenue, Hartford, the property that is the subject of the present action. The joinder of Shlomo and Dvora Attias as party plaintiffs to the above-referenced matter will not serve to deprive this court of subject matter jurisdiction over the subject matter of this action and will serve to protect the present parties from the imposition of inconsistent

SR/219215/hab

decisions with respect to those with interest in the outcome of this matter. The defendant sets forth the following in support of said motion:

1. According to the deposition testimony of Haim Attias on March 9, 2004, Shlomo and Dvora Attias are considered partners in 475 New Britain Avenue, Hartford (p. 12, lines 12-14, attached hereto as Exhibit A).

2. Haim Attias also testified that his parents, Shlomo and Dvora Attias, share in the profits and losses related to the subject property (p. 14, lines 14-25, deposition of Haim Attias, March 9, 2004, attached hereto as Exhibit B).

3. The plaintiff, Joseph Attias, testified in his deposition of March 9, 2004 that his parents, Shlomo and Dvora Attias, paid out the cash to purchase the subject property (p. 141, Lines 3-8, deposition of Joseph Attias, March 9, 2004, attached hereto as Exhibit C).

4. Joseph Attias further testified that the profits and losses for the subject property are shared in equal thirds between Joseph Attias, Haim Attias, and Shlomo and Dvora Attias (p. 140, Line 23 through p. 141, Line 2, deposition of Joseph Attias, March 9, 2004, attached hereto as Exhibit D).

Based on the information provided by the plaintiffs, there is a substantial risk that the failure to cite in Shlomo and Dvora Attias as party plaintiffs in this action may expose the

Law Offices of SKELLEY ROTTNER P.C. ☐ P.O. Box 340890, Hartford, CT 06134-0890 ☐ Phone: (860) 561-7077 Fax: (860) 561-7088
Juris No. 58693

defendant, Patrons Mutual Insurance Company of Connecticut, to the risk of incurring "double, multiple or otherwise inconsistent obligations by reason of the claimed interests" of the additional owners who have a financial interest in the subject property. According to *Local 670 v. International Union, United Rubber, Cork Linoleum and Plastic Workers of America*, 822 F.2d 613 (1987), the rule of joinder is "not to be applied in a rigid manner but should instead be governed by the practicalities of the given case." *Local 670* at 618, *citing Provident Tradesman Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116 n. 12 (1968). As the individuals sought to be included in the action are the parents of the present plaintiff, they are presumably aware of the circumstances of the loss as well as the existence and status of the present action and may be able to provide valuable information to both sides in the present dispute.

The parties have not yet completed discovery in this matter. Therefore, the inclusion of Shlomo and Dvora Attias as party plaintiffs will not serve to prejudice either party. This case has not been assigned for trial.

Law Offices of SKELLEY ROTTNER P.C. ☐ P.O. Box 340890, Hartford, CT 06134-0890 ☐ Phone: (860) 561-7077 Fax: (860) 561-7088
Juris No. 58693

DEFENDANT, PATRONS MUTUAL
INSURANCE COMPANY

By _____
Heather J. Adams-Beman
Skelley Rottner P.C.
P.O. Box 340890
Hartford, CT 06134-0890
Tel. (860) 561-7077
Fax (860) 561-7088
Federal Bar No. ct24091

## CERTIFICATION

I hereby certify that a copy of the above was mailed via U.S. Mail, postage prepaid, on April 7, 2004, to the following counsel of record:

Attorney Cheryl E. Heffernan
Law Office of Cheryl E. Heffernan
2842 Old Dixwell Avenue
Hamden, CT 06518

_____
Heather J. Adams-Beman



EX. A

Page 9

1  add that.
2      MS. HEFFERNAN: I already asked
3  for it.
4  BY MR. ROTTNER:
5      Q. And it says across the top, Ideal
6  Capital, 475 New Britain; what is Ideal
7  Capital?
8      A. Ideal Capital is a firm, a
9  corporation.
10     Q. Is it a corporation?
11     A. I believe so, yes.
12     Q. Why were checks for 475 New Britain
13 being written out on your personal account
14 if Ideal Capital is a corporation?
15     A. That we decided to add later, to
16 have the Ideal name. We decided to adopt
17 it.
18     Q. Was that when you started the
19 second checking account?
20     A. I don't remember.
21     Q. We were here when we discovered you
22 had two checking accounts that were used?
23     A. Yes.
24     Q. And one of them we determined was
25 started in November 2002?

Page 10

1      A. I would assume so, yes.
2      Q. Was that when Ideal Capital was
3  started?
4      A. What exactly do you mean started?
5      Q. Well, you said you decided to adopt
6  the name Ideal Capital?
7      A. At some point, yes.
8      Q. Was that in November of 2002?
9      A. I don't remember.
10     Q. Well, Exhibit 8, for instance, the
11 Quick Book records through December 10,
12 2002, is it fair to --
13     A. From when?
14     Q. December 10, 2002.
15     A. Okay.
16     Q. So is it fair to assume by December
17 10, 2002 that you formed Ideal Capital?
18     A. I believe that Ideal was formed
19 long before December 10. I'm not sure when,
20 but at some point we decided to adopt, you
21 know, and take Ideal as the main, you know,
22 corporation.
23     Q. Did you ever get a checkbook for
24 Ideal Capital?
25     A. Yes, I did.

Page 11

1      Q. When was that?
2      A. Couple months ago, I don't
3  remember.
4      Q. So it was sometime in the year 2003
5  you got a checkbook for Ideal Capital?
6      A. Yes.
7      Q. Why did you open the second
8  checkbook?
9      A. My personal account was involved in
10 paying some or, you know, a lot of these
11 payments. We just decided to make one, you
12 know, account that's going to have to deal
13 with all these things.
14     Q. So the second account, was that
15 going to deal with all these things?
16     A. Yes.
17     Q. The one that was started November
18 2002?
19     A. Yes.
20     Q. Was that going to deal with
21 Waterbury too or was Waterbury altogether
22 separate?
23     A. I'm not sure. I believe that I
24 gave deposits for that property in
25 Waterbury, but I'm not sure which one this

Page 12

1  account, what it was coming from, so I don't
2  know.
3      Q. Why was your account selected to be
4  used?
5      A. No particular reason.
6      Q. Did you file a 2002 tax return?
7      A. No, I didn't.
8      Q. Did you earn any income in 2002?
9      A. No.
10     Q. Did you support yourself in 2002?
11     A. I was living with my parents.
12     Q. And your parents are partners of
13 this building?
14     A. Yes.
15     Q. Did they file a tax return for
16 2002, as far as you know?
17         MS. HEFFERNAN: Just clarify
18 what building?
19         MR. ROTTNER: 475.
20     A. I wouldn't know.
21 BY MR. ROTTNER:
22     Q. What are your parents' names?
23     A. Shlomo and Dvora.
24     Q. Does either your mother or father
25 work?



Page 13

1   A. Currently?
2   Q. In 2002, did they work?
3   A. My mother was working, yes.
4   Q. What did she do?
5   A. She worked for Hadassah
6  organization.
7   Q. Was she paid for that?
8   A. Yes.
9   Q. And did your father work or did he
10  have income? Was he self-employed?
11   A. He was self-employed.
12   Q. What does he do?
13   A. Car accessories.
14   Q. Does he have a busines name?
15   A. Yes.
16   Q. What is that?
17   A. Gold Coast.
18   Q. Does he have a shop that he works
19  out of or something?
20   A. No.
21   Q. Does he work out of his home?
22   A. Out of his home, yes.
23       MR. ROTTNER: We're going to
24  ask for those tax returns.
25       MS. HEFFERNAN: Whose tax

Page 14

1  returns?
2       MR. ROTTNER: The parents.
3       MS. HEFFERNAN: They're not
4  parties to this lawsuit. They're not owners
5  of the property.
6       MR. ROTTNER: He just told me
7  --
8       MS. HEFFERNAN: I'm going to
9  clarify they're not on the deed. I think
10  it's a semantics, language issue, but...
11       MR. ROTTNER: Is it a language
12  issue?
13  BY MR. ROTTNER:
14   Q. I heard from both Joseph and you
15  that your parents have a financial interest
16  in this property.
17   A. My parents were not involved in the
18  daily or anything that has to do with that
19  building.
20   Q. I understand, but you consider them
21  to be an owner and share profits with them?
22   A. Yes.
23   Q. Or losses with them?
24   A. Yes.
25   Q. Okay.

Page 15

1       MS. HEFFERNAN: You can make a
2  motion. Their not owners titled on the
3  policy. They're not a party to this
4  lawsuit.
5  BY MR. ROTTNER:
6   Q. What is the address of your
7  parents?
8   A. 8514 Bell Boulevard, Hollis Hills,
9  New York 11427.
10   Q. Do they speak English, by the way?
11   A. Not so good.
12   Q. What language do they speak?
13   A. Hebrew.
14   Q. Now we've seen a check that you
15  wrote to Terry Leighton for $200 marked as
16  an exhibit during the course of Joseph
17  Attias' deposition.
18   A. Yes.
19   Q. Do you recall writing any other
20  checks to Terry Leighton?
21   A. I don't know. I don't remember. I
22  might have. There is a lot of things that
23  happened with this house almost a year and a
24  half ago. I don't know.
25   Q. Did you buy any materials for the

Page 16

1  job at 475 New Britain Avenue?
2   A. Yes, I did.
3   Q. Where did you buy materials?
4   A. Home Depot, Lowe's, I guess, local
5  stores for some small stuff as well.
6   Q. When you bought the materials at
7  Home Depot and Lowe's, did you enter them in
8  the Quick Books?
9   A. Yes.
10   Q. And did you keep the receipts?
11   A. I believe I did. Then I gave some
12  of them to Joseph, and I don't have them.
13   Q. Why did you give them to Joseph?
14   A. Either he asked for them or there
15  was a situation to bring them to someone.
16  So I just returned them, gave them to him.
17   Q. Do you know what the situation
18  was, if there was a situation?
19   A. What situation?
20   Q. That Joseph wanted to bring the
21  receipts to someone?
22   A. If I had, I don't really remember
23  what specific occasion or not.
24   Q. Okay. Were you involved at all in
25  any efforts to rent 475 New Britain Avenue?



Page 141

1  A. Equal third, me, Haim and my
2  parents.
3  Q. Do your parents have an interest in
4  the insurance proceeds?
5  A. No. That was kind of -- they said
6  -- well, it was here is the money. We
7  thought it was a good thing, so they paid
8  out the cash to buy it.
9  Q. What was the name of the telecom
10 company you were president of?
11 A. Icom Communication.
12 Q. Where did you go to college?
13 A. Haifa University.
14 Q. What was your degree?
15 A. Bachelor.
16 Q. In what?
17 A. Mechanical engineering.
18 Q. Now as you were renovating 475 Main
19 Street --
20 A. No.
21 Q. -- 475 New Britain Avenue -- I'm
22 sorry --
23 A. Right.
24 Q. -- did you make any plans to either
25 rent or sell the property?

Page 142

1  A. Is that a question?
2       MS. HEFFERNAN: Did you make
3  any plans to rent or sell the property?
4  A. We were planning just renting it
5  and keeping it.
6  BY MR. ROTTNER:
7  Q. Okay. And did you make any plans
8  for getting tenants for the property?
9  A. Yes.
10 Q. What plans did you make for getting
11 tenants?
12 A. We talked to brokers. We knew that
13 we had tenants lined up to move into New
14 Britain Avenue. It is a main street and
15 there is a lot of walkers that just walk in,
16 see the house, and there was a lot of demand
17 for residential.
18 Q. What brokers did you talk to?
19 A. We talked to -- what's his name --
20 from Century 21 -- Oliveri.
21 Q. Did you enter into any written
22 agreement with Oliveri?
23 A. On what?
24 Q. What he would do for you?
25 A. No.

Page 143

1  Q. Did you discuss fees he might
2  charge?
3  A. No. I mean it was kind of
4  customary. We didn't get to the point, you
5  know, we would have no problem renting.
6  We're getting people asking when we can move
7  in, and was no shortage of tenants.
8  Q. Did you sit down and talk to Mr.
9  Oliveri to see what he could do for you?
10 A. On what?
11 Q. On renting the property or managing
12 the property.
13 A. Managing, there was nothing -- very
14 little to manage. Maybe he can just be
15 around, since he's local, but there is not
16 much of management. Renting it, you know,
17 renting it, yes, we did speak about market
18 value. No problem getting tenants for this
19 property.
20 Q. Had you had any face-to-face
21 meetings with him about renting?
22 A. It was not a dedicated meeting,
23 just a discussion every time we saw him.
24 Q. When would you see him?
25 A. I've seen him, I think, couple of

Page 144

1  weeks before the fire.
2  Q. And where did you run into him?
3  A. He came to the property.
4  Q. Was he coming to solicit your
5  business?
6  A. He was there. Just saw him on the
7  premises. I don't know why he came.
8  Q. Did he sell you the property?
9  A. Yes.
10 Q. Did you talk about rental rates
11 with him?
12 A. Yes.
13 Q. What did you discuss about rental
14 rates with him?
15 A. What will three bedrooms go for.
16 Q. What did he tell you?
17 A. 750 to 900.
18 Q. Was that with or without utilities?
19 A. I don't remember.
20 Q. Did your apartments come with or
21 without utilities, or were the utilities
22 separately billed?
23 A. We had a separate meter, I think,
24 yes. We had a separate meter for each unit,
25 yes. The tenants paid their own utilities.



Page 137

A. 2001, yes.
Q. In January and February, until you no longer were employed by the telecom company, did you still get your salary?
A. No.
Q. Did you take no income in January or February 2001 from the telecom company?
A. None.
Q. Did other employees not take income?
A. None.
Q. Is there any reason that for the most part the checks that we've seen pertaining to 475 North Main Street in Hartford have been on Haim's account?
A. We found out that we had a Chase account and wanted to save the money on building a corporation. We bought it as a family investment, so it was kind of a convenience that Haim will manage it.
Q. Where is your wife now? Are you living with her or separated?
A. We're divorced.
Q. When did you get divorced? When was the divorce final?

Page 138

A. Well, I hope to get a judgment any day.
Q. Okay.
A. But we separated.
Q. You're almost divorced?
A. Yes. We have a stipulation and everything is done. We are divorced. There is two kinds of divorce. There is one you get that means physically and mentally divorced and we are divorced and the results are there. The civil divorce, you know, there was a stipulation signed by all of us.
Q. You're just waiting to go in front of a judge to approve it?
A. That should be any day
Q. When was the divorce started?
A. What do you mean?
Q. When were the papers first served in the civil divorce?
A. In December of '01.
Q. And was it started by you or your wife?
A. My wife.
Q. And when did you and your wife separate?

Page 139

1  A. Couple months after that.
2  Q. Is the reason that the business is
3  all in Haim's account so your wife won't
4  know about it?
5  A. No. She knew about it. She knew
6  everything.
7  Q. Have you had to pay alimony and
8  support in 2002?
9  A. Sure.
10 Q. What was the source of income that
11 paid that alimony and support?
12 A. Well, in the beginning I had some
13 savings. And when we came out of those
14 savings, we have some money in the family,
15 so that was my parents.
16 Q. Did you have any investment in the
17 stock market or things like that?
18 A. Yes.
19 Q. Do you sell any of those in 2002?
20 A. We had a substantial loss in 2002
21 also, in May 2002.
22 Q. Stock loss?
23 A. S & P.
24     MS. HEFFERNAN: Standards and
25 Poors, stock market.

Page 140

1  A. It's an index, S & P 500. You had
2  the index fund that you lost money. It's
3  not a fund. We were investing in S & P.
4      Greenspan decided to, I guess,
5  lower the interest rate and the account was
6  wiped out.
7  BY MR. ROTTNER:
8  Q. Did you have other savings where
9  you got income from that?
10 A. We had income from?
11 Q. Yes.
12 A. No, not income.
13 Q. Interest income from savings?
14 A. Not substantially interest. At the
15 time it was very low interest as well.
16 Q. Do you have dividends from any
17 stock?
18 A. We had. That is all part of
19 savings.
20 Q. Are you going to file a tax return
21 for 2002?
22 A. No.
23 Q. The profit or loss, whichever
24 happens from 475 Main Street, how is that
25 shared among the participants?

Page 141

1  A. Equal third, me, Haim and my
2  parents.
3  Q. Do your parents have an interest in
4  the insurance proceeds?
5  A. No. That was kind of -- they said
6  -- well, it was here is the money. We
7  thought it was a good thing, so they paid
8  out the cash to buy it.
9  Q. What was the name of the telecom
10 company you were president of?
11 A. Icom Communication.
12 Q. Where did you go to college?
13 A. Haifa University.
14 Q. What was your degree?
15 A. Bachelor.
16 Q. In what?
17 A. Mechanical engineering.
18 Q. Now as you were renovating 475 Main
19 Street --
20 A. No.
21 Q. -- 475 New Britain Avenue -- I'm
22 sorry --
23 A. Right.
24 Q. -- did you make any plans to either
25 rent or sell the property?

Page 142

1  A. Is that a question?
2  MS. HEFFERNAN: Did you make
3  any plans to rent or sell the property?
4  A. We were planning just renting it
5  and keeping it.
6  BY MR. ROTTNER:
7  Q. Okay. And did you make any plans
8  for getting tenants for the property?
9  A. Yes.
10 Q. What plans did you make for getting
11 tenants?
12 A. We talked to brokers. We knew that
13 we had tenants lined up to move into New
14 Britain Avenue. It is a main street and
15 there is a lot of walkers that just walk in,
16 see the house, and there was a lot of demand
17 for residential.
18 Q. What brokers did you talk to?
19 A. We talked to -- what's his name --
20 from Century 21 -- Oliveri.
21 Q. Did you enter into any written
22 agreement with Oliveri?
23 A. On what?
24 Q. What he would do for you?
25 A. No.

Page 143

1  Q. Did you discuss fees he might
2  charge?
3  A. No. I mean it was kind of
4  customary. We didn't get to the point, you
5  know, we would have no problem renting.
6  We're getting people asking when we can move
7  in, and was no shortage of tenants.
8  Q. Did you sit down and talk to Mr.
9  Oliveri to see what he could do for you?
10 A. On what?
11 Q. On renting the property or managing
12 the property.
13 A. Managing, there was nothing -- very
14 little to manage. Maybe he can just be
15 around, since he's local, but there is not
16 much of management. Renting it, you know,
17 renting it, yes, we did speak about market
18 value. No problem getting tenants for this
19 property.
20 Q. Had you had any face-to-face
21 meetings with him about renting?
22 A. It was not a dedicated meeting,
23 just a discussion every time we saw him.
24 Q. When would you see him?
25 A. I've seen him, I think, couple of

Page 144

1  weeks before the fire.
2  Q. And where did you run into him?
3  A. He came to the property.
4  Q. Was he coming to solicit your
5  business?
6  A. He was there. Just saw him on the
7  premises. I don't know why he came.
8  Q. Did he sell you the property?
9  A. Yes.
10 Q. Did you talk about rental rates
11 with him?
12 A. Yes.
13 Q. What did you discuss about rental
14 rates with him?
15 A. What will three bedrooms go for.
16 Q. What did he tell you?
17 A. 750 to 900.
18 Q. Was that with or without utilities?
19 A. I don't remember.
20 Q. Did your apartments come with or
21 without utilities, or were the utilities
22 separately billed?
23 A. We had a separate meter, I think,
24 yes. We had a separate meter for each unit,
25 yes. The tenants paid their own utilities.