# EXCERPTS FROM THE DEPOSITION
# OF ROBERT R. NATTRASS

Law Offices of **SKELLEY ROTTNER P.C.** ☐ P.O. Box 340890, Hartford, CT 06134-0890 ☐ Phone: (860) 561-7077 Fax: (860) 561-7088

**Juris No. 58693**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - x
                                      :
JOSEPH ATTIAS & HAIM ATTIAS,
                                      :
                Plaintiffs,
                                      :  Civil Action
        vs.                              No.
                                      :  3:03 CV01009
PATRONS MUTUAL INSURANCE COMPANY         (SRU)
OF CONNECTICUT,
                                      :
                Defendant.            :

- - - - - - - - - - - - - - - - - - - x


            Deposition of ROBERT R. NATTRASS, FCLS,

    taken pursuant to the Federal Rules of Civil

    Procedure, at the law offices of Farver &

    Heffernan, 2842 Old Dixwell Avenue, Hamden,

    Connecticut, before Janet C. Phillips,

    License #00124, a Registered Professional

    Reporter and Notary Public in and for the

    State of Connecticut, on Wednesday, July 7,

    2004, at 11:05 a.m.

1  investigation that it is his opinion that the

2  plaintiffs overstated the extent of the improvements,

3  the amount spent to improve the property."  Is that

4  what you're going to testify as an expert about?

5       A.   Yes.

6       Q.   And what expertise do you have to give that

7  type of an opinion?

8       A.   As I said, I was an SIU investigator for two

9  insurance companies, Allstate Insurance and USF&G

10  Insurance Company.

11            When I worked for Allstate insurance, they

12  had a requirement that you -- in order to be an SIU

13  investigator, you had to be a claim representative.  So

14  I was sent to claim representative school.  I've been

15  to claim representative school.  I've been to SIU

16  school.  I have copies of those licenses if you want to

17  see them that I was licensed by the State of

18  Connecticut as an adjustor.

19            I was also required by Allstate to take a

20  fraud law course, correspondence course that took over

21  a year, and was tested and received the designation.  I

22  have a copy of the certificate for that if you need to

23  see that.

24            I was a state police officer for 20 years and

25  investigated fraud on a routine basis.  I think I know

2    which I believe is --

3                    MR. ROTTNER:  Mr. Nattrass, the question

4            is what qualifies you to be an expert on

5            value.

6                    THE WITNESS:  On value?

7                    MR. ROTTNER:  Yes, on the opinion that

8            they overstated the loss -- on the opinion

9            that what was the -- on the opinion that they

10            overstated the extent of the improvements and

11            the amount spent to improve the property.

12        A.    I have investigated numerous fraudulent

13    claims involving overstated claims.  I did that for

14    Allstate, I did that for USF&G Insurance.

15        Q.    So because of your investigative background,

16    you're qualified to render an opinion in this case that

17    the plaintiffs overstated their loss; is that your

18    testimony?

19        A.    Yes.

20        Q.    Okay.  Do you have any training in evaluating

21    losses?

22        A.    When I went to adjusting school for Allstate

23    Insurance Company.

24        Q.    Was that back in 1994?

25        A.    Whatever my CV says.

SCRIBES, INC.

4

1              (Curriculum vitae marked Plaintiffs'

2         Exhibit 1 for identification.)

3      Q.   We've just marked Plaintiffs' Exhibit 1.  Is

4  this a current CV?

5      A.   Yes.

6      Q.   And does it list all of the depositions

7  you've taken or cases you've been involved in?

8      A.   No, just recent depositions.

9              MS. HEFFERNAN:  Let me mark this next.

10             (Subpoena and Notice of Deposition

11         marked Plaintiffs' Exhibit 2 for

12         identification.)

13     Q.   I'm going to show you what's been marked as

14  Plaintiffs' Exhibit 2.  And this is the subpoena that

15  you were served that I pulled out of your file,

16  correct?

17     A.   Yes.

18     Q.   And that's for today's deposition?

19     A.   Yes.

20     Q.   And it requires you to bring your file, as

21  well as a current CV.  You have produced your CV, which

22  is marked as Plaintiffs' Exhibit 1, and your current

23  file is in front of me, correct?

24     A.   That's correct.

25             MS. HEFFERNAN:  And I'd like to have the

1              outside cover of that marked as Exhibit 3.

2                   (File marked Plaintiffs' Exhibit 3 for

3              identification.)

4         Q.    Now, do you have another one of your CV so we

5    can go over or should I have copies made so we can

6    discuss this?

7         A.    That's all I have.

8         Q.    Why don't I have copies made.

9                   (Pause in the proceedings.)

10        Q.    While we're waiting on that, your CV contains

11   some information regarding your current depositions?

12        A.    Yes, it does, yes.

13        Q.    And have you ever worked with

14   Attorney Rottner's firm in the past?

15        A.    Yes, I have.

16        Q.    And on how many occasions?

17        A.    I don't recall.

18        Q.    Innumerable or --

19        A.    No, no, no.  Estimate, six times.

20        Q.    Six times over what period of time?

21        A.    Past 10 years.

22        Q.    And what type of cases were those for?

23        A.    Insurance cases, subrogation cases,

24   primarily.

25        Q.    What were your duties?

1    A.   I'm an origin and cause investigator

2  primarily, so it usually has to do with fire origin and

3  cause.

4    Q.   Okay.  You say primarily.  What other

5  functions do you have?

6    A.   I do general investigation work.

7          MR. ROTTNER:  Let's just have a

8          five-minute recess.

9          MS. HEFFERNAN:  Okay.

10          (Recess taken.)

11    Q.   What do you mean by "general investigation"?

12    A.   Okay.  I'm a licensed private investigator in

13  the State of Connecticut.  I can do any type of

14  investigation.  It's probably easiest to tell you what

15  I don't do.  We don't do surveillance.  We don't do

16  domestic types of investigation.

17          We do primarily origin and cause work for

18  fires.  That's our expertise.  But we will do

19  interviewing and statement taking and, you know, we're

20  all retired Connecticut State Police.

21    Q.   Your clients with Acacia, are they the

22  general public or business entities?

23    A.   It's a mix, but it's primarily attorneys and

24  insurance companies.

25    Q.   And the attorneys, are they primarily

1    plaintiff or defense oriented or does it matter?

2        A.    Doesn't matter.

3        Q.    Okay.  How would you --

4        A.    I've worked against insurance companies and

5    I've worked for them.  I've worked for one insurance

6    company against another particular insurance company,

7    and the next day it's just the opposite.

8        Q.    Okay.  What percentage of your business would

9    you say was for the general public?

10       A.    General public?  Probably one percent, two

11   percent.  Very low percent.

12       Q.    And the rest is for business entities?

13       A.    Business, meaning insurance companies and

14   attorneys, yes.

15       Q.    Okay.  Well, the attorneys are, they

16   representing plaintiffs or defendants?

17       A.    Depends.  It doesn't -- if it's a fire --

18   usually we get called on fires.

19       Q.    By insurance companies?

20       A.    By insurance companies and attorneys.  We

21   also get work from -- most of the attorneys that call

22   call for either an insurance company or a target of an

23   insurance company, meaning a product manufacturer or a

24   professional journeyman or something, plumbers.

25       Q.    So a business entity of some sort?

1    A.    Business, yes.

2    Q.    Not generally homeowners; is that fair to

3 say?

4    A.    Homeowners usually do not -- usually call

5 and, in all honesty, we usually refer them to an

6 attorney because they're getting the cart before the

7 horse usually by hiring us.

8    Q.    Okay.  And in this case, you were called down

9 to the Attias' property while the fire was still in

10 process, correct?

11    A.    Correct.

12    Q.    And what were you called to do?

13    A.    I was called to conduct an origin and cause

14 investigation.

15    Q.    And what does that mean?

16    A.    To determine the origin of the fire and what

17 caused it.

18    Q.    Okay.  Wasn't there a fire marshal doing an

19 investigation on the site?

20    A.    There usually -- there always is a fire

21 marshal.  By Connecticut statute, it's required that a

22 fire marshal conduct an origin and cause investigation.

23 But insurance companies conduct independent parallel

24 investigations because the focus is different in a

25 civil investigation than in a criminal investigation,

1    which is what the local fire marshal primarily is

2    concerned with.

3        Q.    What's the difference in focus?

4        A.    The difference in focus is we on the civil

5    side are called in usually for one of two purposes:   To

6    determine the cause, and if we determine it to be an

7    intentionally set incendiary arson fire, to make that

8    determination and to see if there are any indicators

9    that the insured party was involved in that fire

10   because that would give the insurance company grounds

11   for denial of their claim.

12       Q.    Well, how is that different than what the

13   fire marshal is looking for, isn't the fire marshal

14   looking to see whether there is an intentional fire and

15   who is responsible?

16       A.    Well, on the other hand, what the fire

17   marshal will not be able to do in most cases is the

18   other leg of our normal course of action, which is

19   subrogation, subrogation being what caused the fire, an

20   accidental fire, and is there any potential for the

21   insurance company to subrogate against another party

22   for the damages involved.

23       Q.    Okay.  So you first want to see whether the

24   insured was responsible for an intentional fire, and

25   second, to see whether if it was an accidental fire,

1  whether there is someone else who is responsible; is

2  that a summary of what you just said?

3          A.    Well, those are the motivations of the

4  insurance industry.  My job is to find out what caused

5  the fire, how it started, and get documentation, if

6  possible, is there a potential subrogation in an

7  accidental fire, as in this case, would the insurance

8  company have potential to subrogate against someone who

9  did defective work or was there a defective product

10 involved.

11         Q.    Okay.  Is it part of your job to determine

12 the value of a loss?

13         A.    Not normally, but it -- we normally don't do

14 that, no.

15         Q.    Okay.  When you're hired out to be a cause

16 and origin expert, as you were in this case, is it part

17 of your job or was it part of your job in this case to

18 determine the value of the loss?

19         A.    The circumstances of this case were unique in

20 some ways.  Number one, it's usually the exception to

21 the rule that we are able to get to a fire scene while

22 the fire department is still there.  That's the

23 exception to the rule.  Normally, we're called in

24 several days later.  In this case, we had this luxury

25 of being there while the fire was being extinguished

1          MR. ROTTNER:  Object to the form of the

2          question.

3     A.    I just don't recall what I said at this

4  point, other than I know that -- I know for sure that I

5  told her that I thought a statement should be taken

6  from him and all his documents that he had, indicated

7  he had retained.

8     Q.    Did you think it was important to document

9  the information from the contractors on the scene as

10  well?

11          MR. ROTTNER:  I object to the form.  You

12          can answer it.

13     A.    Do I think it was important?

14     Q.    Yes.

15     A.    Yes.

16     Q.    Did you relay that to Mr. Terra or to

17  Attorney Ralphs at any point?

18     A.    I don't recall at this point.

19     Q.    Okay.  Did you recommend any statements other

20  than a statement of the insured?

21     A.    Not that I recall.

22     Q.    You've testified in court before --

23     A.    Yes.

24     Q.    -- as an expert witness?

25     A.    Yes.

59

1      Q.    And in what areas have you testified as an

2    expert witness in court?

3      A.    I testified for origin and cause and as a

4    fraud investigator.

5      Q.    Okay.  As a -- when is the last time you

6    testified as an expert as a fraud investigator, in

7    court, that is?

8      A.    I've got to look.  Okay, it's not listed

9    here.  Many.  The case that I most recall was when I

10   was with Allstate Insurance Company, which was June '94

11   through April '96.  And it was a case -- I'm trying to

12   recall the fellow's name, but it was in Waterbury,

13   Connecticut, in Waterbury Superior Court.  And I just

14   can't recall the name --

15     Q.    Do you know --

16     A.    -- the name of the case.

17     Q.    Do you know what the facts are at all?

18     A.    The facts are that the gentleman had an arson

19   fire in his -- it was a multi-family.  He had Section 8

20   tenants.  And he claimed there were trailers -- it was

21   a device setup, a lantern was set up in the basement

22   with trailers up the staircases with the intent of

23   burning the place to the ground.

24            And there were problems with the case because

25   the local police detective, it was ruled that he seized

1    So it's a cost factor, and insurance companies are

2    always looking at keeping their costs down.

3        Q.    Was there any obvious arson in this case?

4        A.    Upon completing my investigation, no.

5        Q.    Okay.  Was there any obvious source of

6    subrogation in this case?

7        A.    There was a question of potential subrogation

8    because of the furnace situation.

9        Q.    And wasn't it determined that the furnace was

10   about 15 years old prior to your leaving the scene?

11       A.    Yes.

12       Q.    Okay.  So was there any obvious source of

13   subrogation based on your experience?

14       A.    I didn't feel there was.

15       Q.    Okay.

16       A.    But that's not my call.

17       Q.    And in doing your investigation as a cause

18   and origin investigator, what was the significance of

19   determining who paid for paint?

20       A.    Early on in my interviewing, when I spoke

21   with Joseph Attias in the presence of his brother,

22   Mr. Attias made some statements to me that I knew from

23   already having talked -- or being privy to the

24   interview of Juan -- I want to make sure I get the name

25   correct --

1    of that amount, whether that included the purchase

2    price or not or whether that was solely restricted,

3    that investment was solely restricted --

4        A.    No, no.

5        Q.    You never asked him whether it was solely

6    restricted to the renovation amounts, correct?

7        A.    Correct.

8        Q.    You have to let me get the whole question

9    out.

10            And based in part on that assumption that you

11    made, you believed that Mr. Attias was committing

12    fraud?

13        A.    I believed that he was giving me information

14    that was inflated as to the value of the renovation.

15            In addition, when I say he was committing

16    fraud, he gave me other information, for instance, that

17    he had contracts -- all his contractors were licensed.

18    And I found out when I talked to Ramos, that was not

19    true.  So he gave me information that I felt was

20    misleading.

21        Q.    Do you know whether Mr. Ramos had represented

22    to Mr. Attias that he was licensed?

23        A.    He said he had copies of their licenses.

24        Q.    Did you see whether he did have copies of

25    those?

1    a set fire.

2        Q.    Okay.  So at that point you were --

3        A.    But that was not the significant thing that I

4    was getting at here.  What I was getting at is when

5    were you there, did you use a torch, which is an

6    ignition source, no work in the basement, because the

7    fire allegedly started in the basement.  So I asked him

8    what work did you do.  And then he told me what he did.

9    And he said he removed a junk car.  And I said well,

10   you know, what's that got to do with the plumbing, and

11   he said well, that was part of my pay for doing this

12   work were these two junk cars.

13       Q.    What -- in comparing the information you

14   received from Mr. Attias and the information you

15   received from the contractors regarding the work that

16   was done, what inconsistencies did you note?

17       A.    Didn't see $150,000 worth of renovations.

18       Q.    Okay.  Aside from that?

19       A.    License issue.

20       Q.    Okay.

21       A.    There was an issue with permits, too, whether

22   permits were taken out or not taken out, and CO issued.

23   I just recall that.

24             I talked to the building official briefly and

25   he was very short and brusk about, you know, he was

1    property?

2         A.   Yes.

3         Q.   And what documents are those that you

4    reviewed?

5         A.   Receipts provided by the alleged contractor,

6    Ramos.

7         Q.   So this is all information that has been

8    gathered at the scene of the fire?

9         A.   Correct.

10        Q.   Okay.  Have you reviewed any of the

11   deposition transcripts of the contractors that have

12   been deposed during the course of this litigation?

13        A.   No.

14        Q.   Have you reviewed any transcripts of any

15   testimony or examinations under oath of the plaintiffs?

16        A.   No.

17        Q.   Have you reviewed any other documentation

18   regarding contracts or licenses or any other documents

19   that are not currently contained in your file in

20   forming your opinion?

21        A.   No.

22        Q.   And is your opinion any different than what

23   you've testified to already, that it was based on your

24   recollection of Mr. Attias saying he invested $150,000

25   into the property, that he indicated that he had copies

1    of licenses of the contractors, that there had been a

2    permit and something about a CO?

3              MR. ROTTNER:  Would you read that

4         question back?

5                   (Record read.)

6              MS. HEFFERNAN:  I'm going to ask him --

7         Q.    What is your opinion and what's the basis

8    have it?

9         A.    My opinion is from the information that I had

10   at the scene that Mr. Attias was not truthful with me

11   as to his statement of fact, that he attempted to

12   mislead me as to the renovations that were done

13   relative to the windows and electrical work, and that I

14   did not observe work commensurate with $150,000 at the

15   loss location the day of my inspection.

16        Q.    Okay.  So that is your total opinion, expert

17   opinion as disclosed, is that correct?

18             MR. ROTTNER:  The disclosure speaks for

19        itself.  I object to the form.  He's told you

20        what his opinion is.

21             MS. HEFFERNAN:  I think your disclosure

22        is completely inadequate.

23             MR. ROTTNER:  The disclosure speaks for

24        itself.  He gave you his opinion.

25        Q.    Is that your full opinion, sir?

1    So it's a cost factor, and insurance companies are

2    always looking at keeping their costs down.

3         Q.    Was there any obvious arson in this case?

4         A.    Upon completing my investigation, no.

5         Q.    Okay.  Was there any obvious source of

6    subrogation in this case?

7         A.    There was a question of potential subrogation

8    because of the furnace situation.

9         Q.    And wasn't it determined that the furnace was

10   about 15 years old prior to your leaving the scene?

11        A.    Yes.

12        Q.    Okay.  So was there any obvious source of

13   subrogation based on your experience?

14        A.    I didn't feel there was.

15        Q.    Okay.

16        A.    But that's not my call.

17        Q.    And in doing your investigation as a cause

18   and origin investigator, what was the significance of

19   determining who paid for paint?

20        A.    Early on in my interviewing, when I spoke

21   with Joseph Attias in the presence of his brother,

22   Mr. Attias made some statements to me that I knew from

23   already having talked -- or being privy to the

24   interview of Juan -- I want to make sure I get the name

25   correct --

1    A.    At this time.

2    Q.    Is that the full basis of your opinion that

3    you've just described?

4    A.    At this time, without a chance to review --

5    I've had no preparatory time to review anything.

6    Q.    You've had no preparatory time to review

7    anything?

8    A.    Not for this deposition.

9    Q.    Okay.  Did you request additional time to

10    review anything?

11    A.    I requested prepayment for the deposition

12    before I came here.

13    Q.    Okay.  Money, you requested money, that's

14    been a pretty big focus of yours since receiving the

15    deposition subpoena, correct?

16    A.    Well, yes, because I'm dealing -- I don't

17    know what arrangements you have with the brothers

18    Attias, but from the people that I had the opportunity

19    to speak with at the time I had, they were not paid for

20    the work they produced.  So I'm concerned about getting

21    paid for the work I produce.

22              MS. HEFFERNAN:  For the record, I am not

23                 agreeing that this is an expert witness or an

24                 expert deposition.  This is a fact witness.

25                 There's been no opinions that are beyond his

1    fact.  And we can bring it up with the court.

2         MR. ROTTNER:  That's fine.

3         MS. HEFFERNAN:  I think that the

4    disclosure is a complete sham in order to

5    avoid having to pay Mr. Nattrass for his time

6    as a fact witness.

7         MR. ROTTNER:  For the record, if that

8    was your position, then you shouldn't have

9    asked him about the cause and origin of the

10   fire.

11        MS. HEFFERNAN:  That was one of the --

12        MR. ROTTNER:  He's entitled to his time

13   for the cause and origin of the fire.  The

14   only reason I let you inquire as to the cause

15   and origin of the fire is because you're

16   paying for that time.

17        He is not obligated to testify as a fact

18   witness as to the cause and origin of the

19   fire and you owe him that money.  As to

20   whether or not he's qualified as an expert

21   and meets that qualification, that's up to

22   the court.

23        I believe for the record that this

24   witness has adequate qualifications to

25   testify as to the value of the work that was

1     put in there.  And that makes him an expert

2     witness.

3          Are you through with your questions?

4          MS. HEFFERNAN:  I am through with my

5     questions.

6  CROSS-EXAMINATION

7  BY MR. ROTTNER:

8     Q.   I have a couple of questions.

9          How much do you charge for your time,

10  Mr. Nattrass?

11    A.   Investigation is $115 an hour.  Testimonial

12  services are $175 an hour.

13    Q.   And with respect to either subpoena that was

14  served on you, did you receive the fee?

15    A.   The second subpoena, Rich gave me 55 dollars.

16    Q.   And for the first subpoena, you received no

17  fee?

18    A.   No, nothing at all, other than his rudeness.

19    Q.   And would your opinion change if the amount

20  that you had been told had been put in the property was

21  $75,000 than $150,000, would that have changed your

22  opinion?

23    A.   No.

24    Q.   And tell me about the work, what kind -- do

25  you own a three-family house?

# CERTIFIED COPY

## C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___28___ day of __July_____, 2004.

_____
Janet C. Phillips
Notary Public
CSR License #00124

My Commission expires:
October 31, 2006