# EXHIBIT G

**Page 1**

```
 1    UNITED STATES DISTRICT COURT
 2    DISTRICT OF CONNECTICUT
 3    * * * * * * * * *
 4    JOSEPH ATTIAS & HAIM ATTIAS,    *
 5        Plaintiffs,                 *
 6        VS.                         * CIVIL ACTION
 7                                      3:03 CV 01009
                                      *  (SRU )
 8    PATRONS MUTUAL INSURANCE
      COMPANY OF CONNECTICUT,         *
 9
         Defendant.                   *
10    * * * * * * * * *
11             Hamden, CT
12             February 26, 2004
13             10:00 a.m.
14                  - - -
15    DEPOSITION OF JOSEPH ATTIAS
16                  - - -
      APPEARANCES:
17
      FOR THE PLAINTIFFS:
18
      LAW OFFICE OF FARVER & HEFFERNAN
19    BY: CHERYL HEFFERNAN, ESQ.
          2842 Old Dixwell Avenue
20        Hamden, CT 06518
21
      FOR THE DEFENDANT:
22
      LAW OFFICE OF SKELLEY ROTTNER, P.C.
23    BY: JOEL ROTTNER, ESQ.
          433 South Main Street
24        West Hartford, CT 06110
25
```

(COPY stamp)

**Page 2**

```
 1   Deposition of JOSEPH ATTIAS, taken on behalf
     of the Defendant herein, for the purpose of
 2   discovery and for use as evidence in this cause,
     pending in the United States District Court for the
 3   District of Connecticut, pursuant to Notice, before
     Lorraine Calegari, Licensed Shorthand Reporter, No.
 4   SHR 172, and a Notary Public within and for the
     State of Connecticut, at the law offices of Farver &
 5   Heffernan, 2842 Old Dixwell Avenue, Hamden, CT on
     February 26, 2004 at 10:00 a.m. at which time
 6   counsel appeared as herein before set forth . . .
 7
 8
 9
            STIPULATIONS
10
        IT IS HEREBY STIPULATED AND AGREED TO by and
11   among counsel for the respective parties hereto that
     all technicalities as to the proof of the official
12   character of the authority before whom the
     deposition is to be taken are waived.
13
14      IT IS FURTHER STIPULATED AND AGREED TO
     by and among counsel for the respective parties
15   hereto that any objections to the sufficiency of the
     Notice are waived.
16
17      IT IS FURTHER STIPULATED AND AGREED TO
     by and among counsel for the respective parties
18   hereto that all objections, except as to form, are
     reserved to the time of trial.
19
20
21
22
23
24
25
```

**Page 3**

```
 1    Thereupon:
 2       JOSEPH ATTIAS, whose home address is 7883
 3   Cathedral Avenue, Hamstead, New York, being first
 4   duly sworn, as hereinafter certified, was examined
 5   and testified as follows:
 6       MR. ROTTNER:  Usual
 7   stipulations?
 8       MS. HEFFERNAN:  He'll read and
 9   sign.
10   DIRECT EXAMINATION BY MR. ROTTNER:
11    Q. Mr. Attias, could you state your
12   name and address?
13    A. Joseph Attias, 7883 Cathedral
14   Avenue, Hamstead, New York 11050.
15    Q. What is your occupation?
16    A. I'm self-employed.
17    Q. What do you do?  How do you earn a
18   living?
19    A. Full-time real estate investor.
20    Q. And do you own multiple properties?
21    A. Now we do.
22    Q. And for how long have you owned
23   multiple properties that you said "now we
24   do"?
25    A. Well, we owned a couple of months
```

**Page 4**

```
 1   475 New Britain Avenue, which was the first
 2   property that we bought as investment
 3   property.
 4    Q. So 475 New Britain Avenue was the
 5   first property you bought as an investment
 6   property?
 7    A. We bought only investment property.
 8    Q. When you say "we," who is the "we"?
 9    A. My brother and myself and my
10   parents.
11    Q. Do you have a business name that
12   you go under?
13    A. Now we do, which is Ideal Capital
14   Fund.  At the time we just bought it
15   personally.
16    Q. Okay.  How much did you pay for 475
17   New Britain Avenue?
18    A. Sixty-five.
19    Q. And how did you locate that
20   property?
21    A. Found it on the Internet.
22    Q. Where on the Internet?
23    A. Multiple sites you can see.
24    Q. Do you remember which one you found
25   it on?
```

Page 161

1 amount even though there was some money in escrow.
2 It was a big -- the answer is no, we did not see any
3 dime of that money.
4   Q. Did you talk to the bank about how
5 you would rebuild?
6   A. At one point they were considering
7 on rebuilding, yes, and converting it to a
8 loan, into a construction loan. And then we
9 realized it would be too expensive for us.
10   Q. Why would it be too expensive?
11   A. Because we got offers to build the
12 house for 400,000, 350,000, and I said it's
13 ridiculous, doesn't make any sense.
14   Q. What did you decide to do then?
15   A. We decided pretty much to maybe
16 sell it as-is.
17   Q. Have you tried to sell it as-is?
18   A. We got some offers, but decided
19 it's not worth it. We got a 20,000 offer.
20 We said no, hell, we're going to keep it.
21   Q. How did you arrive at the amount of
22 the insurance?
23   A. I don't understand the question.
24   Q. $200,000, I think, was the amount
25 of the insurance.

Page 162

1   A. When we sat down with --
2 initially Scott was on the premises and says
3 that's the total loss. We just looked at
4 the numbers and it was very simple, we
5 thought it would be around 220 or 250. We
6 did not know the exact amount.
7     Then we were expecting the claim to be paid
8 right away. We gave them everything. We got
9 advice. Everything was fine. We were waiting for
10 that money to start recovering the loss.
11     It's still a shocking experience to buy the
12 property out of state and then there is a big
13 commotion and the whole thing is gone. So we went
14 through trauma with this fire.
15     And then the insurance was dragging us,
16 which was added to this commotion.
17     What was the question? I lost my train of
18 thought.
19   Q. The question was: When you
20 purchased the insurance, how did you arrive
21 at $200,000?
22   A. We sat down at that point after we
23 realized we were not going to get paid in a
24 reasonable time and we hired a public
25 adjuster.

Page 163

1     MS. HEFFERNAN: No. The
2 question was: When you got the insurance,
3 the original insurance dating back --
4     THE WITNESS: The binder you're
5 talking about, that binder stage?
6 BY MR. ROTTNER:
7   Q. Yes.
8   A. We thought that it was -- we didn't
9 know -- like the policy we got was only a
10 binder. The binder was $200,000.
11   Q. How did you arrive at the 200,000,
12 that's what I'm trying get at?
13   A. We didn't look at the binder. We
14 thought if it would be sufficient for the
15 bank, it would be good for us.
16   Q. Okay. You thought if it was good
17 enough for your bank, it was good enough for
18 you?
19   A. We didn't look at the numbers,
20 right. We didn't know we have $500 for this
21 and all that stuff.
22   Q. Just focusing on the house, how did
23 you choose on a limit of $200,000 for the
24 house?
25   A. It was not an option, not that we

Page 164

1 had choices. We sat with an insurance man
2 and they faxed us a binder for 200,000 and
3 that's what they did.
4   Q. Enough for the closing?
5   A. Enough for the closing. And we
6 felt, even though we had insurance, even
7 when we bought it before, even if we
8 refinanced, we bought the insurance.
9     MS. HEFFERNAN: What his
10 question is: When you got the insurance,
11 how come out it was a $200,000 policy?
12     THE WITNESS: That was
13 presented to us and we didn't question it.
14 BY MR. ROTTNER:
15   Q. Who presented it to you?
16   A. The agent, whatever his name is.
17   Q. The agent suggested $200,000?
18   A. He sent us a binder. We looked at
19 the numbers. I said fine.
20   Q. Then after the fire you fund
21 $200,000 was not enough to rebuild?
22   A. Not sufficient.
23   Q. How much do you need to rebuild?
24   A. Over 130,000.
25   Q. Do you have any idea where Juan

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3   JOSEPH ATTIAS & HAIM ATTIAS    :  CIVIL ACTION NO.

 4   VS.                            :  3:03 CV 01009 (SRU)

 5   PATRONS MUTUAL INSURANCE       :

 6   COMPANY OF CONNECTICUT         :  JUNE 17, 2004

 7

 8

 9            CONTINUED DEPOSITION OF JOSEPH ATTIAS

10

11

12   A P P E A R A N C E S :

13        For the Plaintiff:
             FARVER & HEFFERNAN
14           2842 Old Dixwell Avenue
             Hamden, Connecticut  06518
15           BY:  CHERYL E. HEFFERNAN, ESQ.

16        For the Defendant:
             SKELLEY ROTTNER P.C.
17           433 South Main Street
             West Hartford, Connecticut  06110
18           BY:  JOEL J. ROTTNER, ESQ.

19

20   A L S O    P R E S E N T :

21        Mr. Haim Attias

22              SULLIVAN & ASSOCIATES, LLC
                Licensed Shorthand Reporters
23                    2 Lindsay Lane
              Broad Brook, Connecticut  06016
24                 Jana F. Ahrens, L.S.R.
                     (860) 871-7574
25
```

property was worth?

A. Somewhere around there.

Q. If you spent 65,000 for the property and if you only invested 25, and I know we may disagree on that number, --

A. Okay.

Q. -- would you agree with me if you then sold it for 185, and we'll forget all the closing costs and all the other costs involved, that you would have had a $95,000 profit?

A. If your numbers are correct then it makes sense, yes.

Q. And after the fire if you rebuilt it and if you assume it was 400,000 to rebuild it, you understood you would have to spend 200,000 of your own money to rebuild it?

A. Uh-huh.

Q. And if you then rebuild it and sold it for anywhere around 185, that would be a bad loss; you'd agree with me on that?

A. If you're going to go through the expense, but it didn't make sense to rebuild.

Q. Exactly. That's why it doesn't make sense?

A. At the time.

Q. That's my point. It wouldn't make sense to

SULLIVAN & ASSOCIATES, LLC



rebuild because going through the expense just cost you a lot of money?

    A. Because I don't have that money.

        MS. HEFFERNAN: Objection to the form. If you're looking to sell the property.

BY MR. ROTTNER:

    Q. If you're looking to sell the property.

    A. Right, but also you can do a rental because that's an income property.

    Q. I understand. Now, if after the loss there was an actual cash value claim to the insurance company --

    A. What is -- explain to me what is actual cash value?

        MS. HEFFERNAN: Let him ask his whole question, and then if you don't understand his question then you go from there, okay?

BY MR. ROTTNER:

    Q. Instead of rebuilding the property you make an actual cash value claim, what's the property worth, and if the property is worth according to Mr. Vizzo's testimony on an actual cash value claim 65,000 plus what you put into it, and again assuming 25, then according to Mr. Vizzo you would get 90,000 from the company; do you understand that, according to Mr. Vizzo?

        MS. HEFFERNAN: Objection to the form of