# EXHIBIT  I

Westlaw.

53 Pa. D. & C.4th 533                                                                                          Page 1
2001 WL 1820335 (Pa.Com.Pl.), 53 Pa. D. & C.4th 533

C
Court of Common Pleas of Pennsylvania,
Mercer County.
Rotell
v.
Erie Insurance Group
**No. 1997-55.**

March 16, 2001

West Headnotes

**Insurance** ⌾2182
217k2182 Most Cited Cases
The replacement cost provision in plaintiff's
homeowner's policy was enforceable, where
the language of the provision was
unambiguous and where it did not limit the
defendant insurer's liability to the actual
cash value of the property unless actual
replacement had been made.
Jason E. Matzus, for plaintiff.

Paul K. Geer, for defendant.

FORNELLI, P.J.

The matter for disposition is defendant's
motion for judgment on the pleadings
regarding Count I of plaintiff's complaint.
For the reasons set forth hereafter,
defendant's motion will be granted.

This matter arises out of a fire that damaged
plaintiff Cathy M. Rotell's home on January
10, 1996. Prior to the fire, plaintiff had
purchased a homeowner's insurance policy
from defendant Erie Insurance Group which
*535 provided fire loss coverage. This
policy was in full force and effect at the time
of plaintiff's aforementioned loss. Defendant
accepted liability for the damage to
plaintiff's home and paid the full repair cost

of the structure.

A dispute between the parties arose as to
the value of plaintiff's personal property
destroyed in the fire, as well as the method
of determining how much of the loss would
be covered by defendant. Pursuant to the
language of the policy, parties appointed
appraisers to determine both the actual cash
value of the destroyed property and the
property's replacement cost. The appraisers
determined that the actual cash value of the
property was $41,597.54 and the
replacement cost of the property was
$71,303.02. Defendant made payment to the
plaintiff in the amount of $30,597.54,
representing the actual cash value of the
property minus $11,000 in advances made
by defendant. There is no evidence that
either party has challenged the appraisers'
findings and determinations.

Subsequent to defendant's payment of
actual cash value less advances, plaintiff
demanded the full replacement cost, [FN1]
as determined by the appraisers, of the lost
personal property. At the time plaintiff made
her demand, she had not replaced all of the
items of personal property lost in the fire.
The policy at issue provides that, if the
entire loss is greater than $1,000. Defendant
will not pay *536 more than the actual cash
value until actual repair or replacement is
completed. [FN2]

> FN1. The policy defines replacement
> cost as "the cost, at the time of loss,
> of a new article identical to the one
> damaged, destroyed or stolen. If the
> identical article is no longer
> manufactured or is not available, we
> will pay the cost of a new article
> similar to that damaged or destroyed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and which is of comparable quality and usefulness." See policy at replacement cost settlement on personal property endorsement.

FN2. The policy states "[w]e will pay no more than the actual cash value of the damage until actual repair or replacement is completed...." See policy at replacement cost settlement on personal property endorsement.

On January 8, 2000, plaintiff filed her complaint, demanding payment of the aforesaid replacement cost of her lost personal property. Defendant maintains that, under the policy, plaintiff is only entitled to replacement cost if she first replaces the lost items. Defendant has advised plaintiff that she could obtain full replacement cost if she used her actual cash value payment to purchase additional items, and, if the actual cash value payment was insufficient, defendant would make payment directly to a store or vendor. Plaintiff found this arrangement to be unsatisfactory.

Defendant filed the instant motion for judgment on the pleadings regarding Count I of plaintiff's complaint (the replacement cost provision), and requests that this court give effect to the policy language, as aforesaid, thus dismissing Count I of plaintiff's complaint. Plaintiff contends that the replacement cost provision of the policy is violative of public policy, and, therefore, is void and unenforceable, and, thus, plaintiff is entitled to the replacement cost of her lost personal property, despite the policy language.

A.

Pennsylvania Rule of Civil Procedure 1034(a) provides that "[a]fter the relevant pleadings are closed, but within *537 such

time as not to unreasonably delay the trial, any party may move for judgment on the pleadings." Pa.R.C.P. 1034(a); see also, Mellon Bank N.A. v. National Union Ins. Co., 768 A.2d 865 (Pa. Super. 2001). The Superior Court has consistently held that "[a] motion for judgment on the pleadings is similar to a demurrer. It may be entered when there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law." Mellon Bank, 768 A.2d at 868 (quoting Citicorp North America Inc. v. Thornton, 707 A.2d 536, 538 (Pa. Super. 1998)); see also, Kelaco v. Davis & McKean General Partnership, 743 A.2d 525, 528 (Pa. Super. 1999); Cole v. Lawrence, 701 A.2d 987, 988 (Pa. Super. 1997); Vetter v. Fun Footwear Co., 447 Pa. Super. 84, 87, 668 A.2d 529, 530-31 (1995) (en banc).

In determining whether there is a dispute of facts, this court must restrict its consideration to the pleadings and those relevant documents attached thereto. Kelaco, 743 A.2d at 528; Thornton, 707 A.2d at 538; Cole, 701 A.2d at 988; Vetter, 447 Pa. Super. at 87, 668 A.2d at 530-31. Furthermore, this court must accept as true all well-pleaded facts of the non-moving party, while considering against it only those facts it specifically admits. Mellon Bank, 768 A.2d at 868.

B.

The Pennsylvania Supreme Court, in Standard Venetian Blind Co. v. American Empire Insurance Co., 503 Pa. 300, 304-305, 469 A.2d 563, 566 (1983), concisely summarized the principles governing the interpretation of insurance policy language, holding that the goal of *538 such interpretation is ascertaining the intent of the parties as manifested by the language of the written contract. See also, Koenig v. Progressive Insurance Co., 410 Pa. Super. 232, 236, 599 A.2d 690, 691-92 (1991),

53 Pa. D. & C.4th 533
2001 WL 1820335 (Pa.Com.Pl.), 53 Pa. D. & C.4th 533

Page 3

appeal denied, 531 Pa. 640, 611 A.2d 712 (1992). It went on to hold:

"Where a provision of a policy is ambiguous, ... [it] is to be construed in favor of the insured and against the insurer, the drafter of the agreement.... Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." Standard Venetian Blind, 503 Pa. at 305, 469 A.2d at 566. (citations omitted) While the proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured, Dibble v. Security of America Life Insurance Co., 404 Pa. Super. 205, 210, 590 A.2d 352, 354 (1991), an insured may not complain that his or her reasonable expectations were frustrated by policy limitations that are clear and unambiguous. Zawierucha v. Philadelphia Contributionship Insurance Co., 740 A.2d 738, 741 (Pa. Super. 1999), appeal denied, 563 Pa. 608, 757 A.2d 934 (2000); St. Paul Mercury Insurance Co. v. Corbett, 428 Pa. Super. 54, 59, 630 A.2d 28, 30 (1993), appeal discontinued, 535 Pa. 658, 634 A.2d 221 (1993).

Defendant cites Reese v. Northern Insurance Company of New York, 207 Pa. Super. 19, 24, 215 A.2d 266, 269 (1965), in which the Superior Court reviewed a replacement cost provision that did not mandate the actual repair or replacement of lost items prior to payment of replacement cost. The court stated, in dicta, that "[h]ad such a clause been included in the present policy, there would *539 be some justification for defendant's contention [that the insured is not entitled to full replacement cost until and unless he actually replaces or rebuilds] but such was not the case." Reese, 207 Pa. Super. at 25, 215 A.2d at 269. Thus, the Reese court did not actually endorse the replacement cost provision, but merely stated that the existence of such a provision would have supported insurer's argument. Reliance on Reese for the proposition that it supports the validity of a replacement cost provision is, therefore, tenuous.

Defendant also cites Canulli v. Allstate Insurance Company, 315 Pa. Super. 460, 462 A.2d 286 (1983) for the proposition that the court there determined that the requirement of actual repair or replacement prior to payment in excess of actual cash value was, as a matter of law, consistent with the applicable contract, the applicable statute (40 Pa.C.S. § 636) and previous judicial interpretation of that statute. This is an inaccurate reading of Canulli. In Canulli, the Superior Court held that the trial court's order, granting partial summary judgment in favor of the defendant/insurer in a fire loss claim, which did not terminate litigation between the parties or preclude insureds from litigating their cause of action, was interlocutory, and therefore not final and appealable. Canulli, 315 Pa. Super. at 465, 462 A.2d at 290. Thus, the Superior Court lacked jurisdiction and quashed the appeal as improperly taken. Id. The language cited by defendant, relating to the validity of the replacement cost provision, appears in the Canulli opinion in an excerpt from the trial court's order quoted therein. See id. at 464, 462 A.2d at 288. However, the Superior Court neither endorsed the trial court's reading of the policy at issue *540 nor its legal evaluation thereof; the Superior Court merely quashed the appeal for lack of jurisdiction. Thus, there is no merit to defendant's contention that Canulli stands for any proposition related to the validity of a replacement cost provision similar to the one at issue here.

Plaintiff relies on the holding in Ferguson v. Lakeland Mutual Insurance Company, 408 Pa. Super. 332, 596 A.2d 883 (1991), appeal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Pa. D. & C.4th 533                                                      Page 4
2001 WL 1820335 (Pa.Com.Pl.), 53 Pa. D. & C.4th 533

denied, 531 Pa. 639, 611 A.2d 712 (1992), in support of her argument on unconscionability. In Ferguson, the Superior Court held that a homeowner's insurance policy provision that limited the insurer's liability to actual cash value of the property unless replacement has been made was void as unconscionable, because it required the insured to expend a large sum of money prior to a liability determination. Ferguson, 408 Pa. Super. at 337, 596 A.2d at 885.

In assessing the validity of the policy provision, the Ferguson court relied on the test set forth in Koval v. Liberty Mutual Insurance Company, 366 Pa. Super. 415, 531 A.2d 487 (1987), appeal denied, 518 Pa. 619, 541 A.2d 746 (1988). Koval held: "[T]he test for 'unconscionability' is two-fold. First, one of the parties to the contract must have lacked a 'meaningful choice' about whether to accept the provision in question. Second, the challenged provision must 'unreasonably favor' the other party to the contract." Koval, 366 Pa. Super. at 423-24, 531 A.2d at 491. (citations omitted) Ferguson concluded that insurance contracts are contracts of adhesion and therefore, the parties had unequal bargaining power with the insured being forced to adhere to the insurer's terms, satisfying the first prong of the Koval test. Ferguson, 408 Pa. Super. at 336, 596 A.2d at 885. Ferguson also *541 held that "the second prong of the Koval test is also met: the challenged provision unreasonably favors appellant. Since appellant denied liability, appellees were faced with the unsavory choice of either accepting the lower actual cash value of the organ or expending a large sum of money in replacement costs without a guarantee of reimbursement. In fact, under the terms of the contract, appellees could have only received replacement value in this instance after expending the replacement or repair funds and obtaining a judicial determination

concerning liability." Id. at 336-37, 596 A.2d at 885. (emphasis supplied)

Plaintiff attempts to bolster her argument by citing Gilderman v. State Farm Insurance Company, 437 Pa. Super. 217, 649 A.2d 941 (1994), allocatur denied, 541 Pa. 626, 661 A.2d 874 (1995). Gilderman held that an insurer that has agreed to pay repair or replacement costs less depreciation in advance of actual repair or replacement of a covered loss may not automatically withhold both depreciation and a flat 20 percent representing contractor overhead and profit from its advance payment. Gilderman, 437 Pa. Super. at 219, 649 A.2d at 942. The court noted that the insurer and amicus curiae attempted to reframe the issue into: whether a replacement cost provision similar to the one at issue instantly was void as against public policy, in a "thinly disguised attempt ... to limit the holding" in Ferguson. Id. at 222, 649 A.2d at 943-44. The court stated:

"In Ferguson, we struck down as void against public policy a provision requiring an insured who procured replacement cost coverage to actually replace property before receiving the full replacement value of the property.*542 In that case, the insurer denied coverage. We reasoned that it was unconscionable to require insureds to procure from their own funds, which they may not have, replacement property prior to receipt of replacement cost since the insureds expected to receive such coverage by purchasing replacement value coverage." Id. at 222-23, 649 A.2d at 944. [FN3] Despite this language, the court later concluded that "[a]ppellants have not asked us to declare void as against public policy the provision requiring repair or replacement prior to payment of full repair or replacement costs. Amicus curiae and State Farm will have to wait to have the issue

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Pa. D. & C.4th 533
2001 WL 1820335 (Pa.Com.Pl.), 53 Pa. D. & C.4th 533

revisited--in a case wherein it is raised." Id. at 223, 649 A.2d at 944. Thus, it appears that the Superior Court has left the door open for a case like the one at bar.

> FN3. This court notes that Gilderman's summary of the Ferguson holding is inaccurate when read against the actual language of Ferguson, quoted herein.

### C.
The case at bar presents facts substantially dissimilar to those in Ferguson. Here, defendant admitted liability and guaranteed reimbursement to plaintiff or plaintiff's vendors if plaintiff actually replaced the lost items. Thus, Ferguson's reasoning is inapplicable here and the policy provision must be evaluated under both basic contract law and the standards set forth in Koval and Standard Venetian Blind.

The provision here simply and clearly provides that the defendant "will pay no more than the actual cash value of the damage until actual repair or replacement is completed ...." (*543 See policy at replacement cost settlement on personal property endorsement.) Therefore, the language of the contract is clear and unambiguous and this court is required to give effect to that language. Standard Venetian Blind, 503 Pa. at 305, 469 A.2d at 566. [FN4] Because the policy provision is clear and unambiguous, plaintiff may not argue that her reasonable expectations have somehow been frustrated here. Zawierucha, 740 A.2d at 741; Corbett, 428 Pa. Super. at 59, 630 A.2d at 30.

> FN4. See also, Kastendiek v. Millers Mutual Insurance Co., 946 S.W.2d 35, 40 (Mo. Ct. App. 1997); Brachter v. State Farm Fire and Casualty Co., 961 P.2d 828, 831 (Okla. 1998)

(holding replacement cost provisions making payment of replacement cost dependant upon actual repair or replacement are unambiguous).

Next, the present policy provision must be evaluated as to unconscionability. Inquiries into the unconscionability of contract clauses are questions of law for the court to decide. Bishop v. Washington, 331 Pa. Super. 387, 399, 480 A.2d 1088, 1094 (1984). Applying the Koval test, as did the Superior Court in Ferguson, shows substantial differences between the present case and Ferguson. With respect to the first prong of the Koval test, insurance contracts are contracts of adhesion and therefore, the parties had unequal bargaining power with the insured being forced to adhere to the insurer's terms, satisfying lack of bargaining power requirement. Ferguson, 408 Pa. Super. at 336, 596 A.2d at 884; Bishop, 331 Pa. Super. at 400, 480 A.2d at 1094. However, the fact that a contract is adhesive does not necessarily render it unenforceable. Neil v. Allstate Insurance Co., 379 Pa. Super. 299, 313, 549 A.2d 1304, 1311 (1988). Thus, although the provision *544 here likely meets the first prong of the Koval test, as plaintiff lacked a meaningful choice as to acceptance of the provision, this alone does not render the replacement cost provision unenforceable.

Satisfaction of the second prong of the Koval test turns on whether the challenged provision unreasonably favors defendant. Koval, 366 Pa. Super. at 423-24, 531 A.2d at 491. The Ferguson court, in the above-quoted excerpt, makes clear that its finding that the provision there unreasonably favored insurer was based on: (1) insurer's denial of liability; (2) insureds' "unsavory" choice of either accepting actual cash value or expending a large sum in replacement costs without a guarantee of reimbursement;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

53 Pa. D. & C.4th 533                                                                 Page 6
2001 WL 1820335 (Pa.Com.Pl.), 53 Pa. D. & C.4th 533

and (3) any payment of replacement value by insurer hinged on either expending funds or obtaining a judicial determination of liability. Ferguson, 408 Pa. Super. at 336-37, 596 A.2d at 885. Thus, the Ferguson replacement cost provision was deemed unconscionable despite its clear and unambiguous language.

None of the elements relied upon by the Ferguson court in determining the provision there to be unconscionable are present in the instant matter. Here, the defendant has accepted liability for the lost items of personal property, eliminating any need for judicial determination of liability as a prerequisite to recovery. Moreover, while plaintiff must actually repair or replace the property prior to receiving replacement value, she is certainly not faced with the aforesaid choice of accepting actual cash value or expending a large sum without guarantee of reimbursement. Defendant is quite willing to make payment directly to the vendors/dealers of the replacement property, eliminating any out-of-pocket expenditure by **\*545** plaintiff and any uncertainty as to the availability of payment. Thus, the provision at issue does not unreasonably favor defendant. [FN5]

> FN5. The provision does favor defendant insofar as it limits defendant's payment of replacement value to the value of those items actually repaired/replaced. However, plaintiff is nonetheless entitled to the actual cash value of any items she does not repair or replace. This is the coverage she purchased and she must abide by the terms thereof.

Plaintiff argues that she paid for replacement cost coverage and is entitled to the replacement value of her property notwithstanding her failure to repair or

replace the lost items. The clear and unambiguous language of the policy states otherwise and the premiums paid by plaintiff presumably reflect this. Thus, Ferguson and Gilderman are inapposite and inapplicable to the instant matter. [FN6] This court must give full force and effect to the **\*546** contract language. The replacement value provision of the instant policy is not void as unconscionable. Because the clear and unambiguous language of the replacement value provision conditions payment of replacement cost upon the actual repair or replacement of the items of covered loss, plaintiff must abide by this condition in order to be entitled to her replacement cost.

> FN6. Even if Ferguson and Gilderman were extended to the case at bar, this court has substantial reservations concerning the soundness of the reasoning therein. Ferguson predicates unconscionability on the insurer's denial of liability. Similarly, State Farm Fire and Casualty Ins. Co. v. Micelli, 518 N.E.2d 357, 362 (Ill. App. Ct. 1987), appeal denied, 522 N.E.2d 1257 (Ill. 1988), held that insureds' failure to repair/replace lost property, as required by the policy, did not preclude recovery of replacement cost, where insurer made compliance with said condition impossible by denying liability. However, the denial of liability is not material to a determination of a policy's unconscionability. Regardless of whether the insurer has accepted or denied policy liability, the insured may still be required to litigate the appropriate measure of damages and the preconditions thereof. Moreover, this reasoning runs counter to long-standing basic contract law. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insurer has provided a limited means for insured to obtain replacement cost for lost property. For this limited right and the risk associated therewith, insurer has charged a given premium. Had plaintiff desired different or broader replacement cost coverage, she was free so to contract, with the requisite increased premium reflecting the absence of a repair or replacement precondition. The Ferguson and Micelli holdings ignore the actual bargain made by the parties to the insurance contract, enlarging the coverage of the policy beyond its natural and obvious meaning, thereby negating the parties' intent. Absent an ambiguity, the parties' expectations are contained in the policy language and ought to be enforced.

While Ferguson and Gilderman appear to be the only Pennsylvania cases that evaluate replacement cost provisions, this court's survey of the relevant case law from other jurisdictions augments the above conclusion. Generally, actual replacement of damaged or destroyed property has been held to be a valid prerequisite to the collection of proceeds under a replacement cost endorsement of an insurance policy. Randy R. Koenders, Annotation, Construction and Effect of Property Insurance Provision Permitting Recovery of Replacement Cost of Property, 1 A.L.R.5th 817, 829 (1992). A thorough reading of the Annotation and cases cited therein, as well as this court's independent research, reveal nearly unanimous support for the validity of replacement cost provisions that predicate payment of replacement value upon actual repair or replacement. See e.g., Hilley v. Allstate Insurance Co., 562 So.2d 184, 189 (Ala. 1990); Hess v. North Pacific Ins. Co., 859 P.2d 586, 590 (Wash. 1993); BSF Inc.

v. Cason, 333 S.E.2d 154, 157-58 (Ga. Ct. App. 1985); *547 Higginbotham v. American Family Insurance Co., 493 N.E.2d 373, 375 (Ill. App. Ct. 1986); Ferrara v. Insurance Co. of North America, 521 N.Y.S.2d 668, 670 (N.Y. App. Div. 1987); Miller v. Farm Bureau Town & Country Insurance Co., 6 S.W.3d 432, 438 (Mo. Ct. App. 1999); Kastendieck v. Millers Mutual Insurance Co., 946 S.W.2d 35, 39-40 (Mo. Ct. App. 1997); Bratcher v. State Farm Fire and Casualty Co., 961 P.2d 828, 831 (Okla. 1998); Snellen v. State Farm Fire and Casualty Co., 675 F. Supp. 1064, 1067 (W.D. Ky. 1987) (applying Kentucky law); Lerer Realty Corp. v. MFB Mutual Insurance Co., 474 F.2d 410, 413 (5th Cir. 1973), reh'g denied, 477 F.2d 596 (5th Cir. 1973) (applying Texas law); Kolls v. Aetna Casualty and Surety Co., 503 F.2d 569, 570 (8th Cir. 1974) (applying Iowa law); Whitmer v. Graphic Arts Mutual Insurance Co., 410 S.E.2d 642, 645-46 (Va. 1992).

Because the replacement value provision of the policy at issue is unambiguous, and because substantial differences exist between the policy provision here and the one deemed unconscionable in Ferguson, the provision here does not meet the second prong of the Koval test and, therefore, is not void as unconscionable. Accordingly, defendant's motion for judgment on the pleadings as to Count I of plaintiff's complaint will be granted.

Hence, this order:

## ORDER

And now, March 16, 2001, it is hereby ordered that defendant's motion for judgment on the pleadings regarding Count I of plaintiff's complaint is granted.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.
CLT TELECOMMUNICATIONS CORP.
v.
COLONIAL DATA TECHNOLOGIES
CORP., et al.
**No. 3:96CV2490 (AHN).**

March 21, 1999.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NEVAS, District J.

*1 The plaintiff, CLT Telecommunications Corporation ("CLT"), brings this diversity action against the defendants, Colonial Data Technologies Corporation ("Colonial"), Walter M. Fiederowicz ("Fiederowicz"), and John N. Giamalis ("Giamalis"), raising claims for breach of contract, intentional misrepresentation, negligent misrepresentation, and breach of fiduciary duty.

Now pending before the court is the defendants' Motion for Summary Judgment. For the reasons set forth below, the motion [doc. # 46] is GRANTED.

## STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. See Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). The burden of showing that no material factual dispute exists rests on the party seeking summary judgment. See *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). After discovery, if the nonmovant "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

The substantive law governing the case identifies those facts that are material on a motion for summary judgment. See *Anderson,* 477 U.S. at 258. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation and internal quotation marks omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (citation and internal quotation marks omitted).

In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the nonmovant. See *Anderson,* 477 U.S. at 255. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

Cir.1991).

### FACTS

CLT is a Taiwanese corporation and maintains its principal place of business in Mialo-Li City, Taiwan. (*See* Pl.'s Responses to Defs.' First Set of Interrogs. at 1 [hereinafter "Pl.'s Interrogs. Resp."]; Compl. ¶ 1.) CLT is primarily engaged in the business of manufacturing and distributing telecommunications products, including cordless telephones. (*See* Aff. of Phillip Chu ¶ 2 [hereinafter "Chu Aff."].) Phillip Chu ("Chu") was CLT's Executive Director from February 1, 1995, until December 1996. (*See* Pl.'s Interrogs. Resp. at 1.)

*2 Colonial is a Delaware corporation with its principal place of business in New Milford, Connecticut. (*See* Compl. ¶ 2.) It is engaged in the telecommunications business and specializes in caller identification technology. (*See* Chu Aff. ¶ 7.) At all times relevant to this action, Giamalis was the Vice President and Chief Financial Officer of Colonial. (*See* Aff. of John N. Giamalis ¶ 2 [hereinafter "Giamalis Aff."].) Fiederowicz, a director of Colonial, was the Chairman of Colonial's Board of Directors from approximately September 1994, until March 1996. (*See* Decl. of Walter M. Fiederowicz ¶ 1 [hereinafter "Fiederowicz Decl."].)

In March 1993, G-Communications, Inc. ("G-Communications") commenced its operations in Irwindale, California. (*See* Dep. of Hans Smarius at 21 [hereinafter "Smarius Dep."].) Hans Smarius ("Smarius") was both the president and a director of G-Communications. (*See id.*)

On October 30, 1994, G-Communications first contacted CLT in order to request production information. (*See* Pl.'s Interrogs.

Resp. at 2.) On February 9, 1995, CLT commenced manufacturing cordless telephone units for G-Communications on a purchase order basis. (*See* Pl.'s Interrogs. Resp. at 2; Chu Aff. ¶ 5.) CLT received payment for this first purchase on February 24, 1995. (*See* Pl.'s Interrogs. Resp. at 2.)

In April 1995, because G-Communications was experiencing financial difficulties, it had several discussions with CLT concerning future payment terms. (*See* Dep. of Philip Chu on 3/18/98 at 35 [hereinafter "Chu Dep. 3/13/98"]; Pl.'s Interrogs. Resp. at 2.) It was ultimately decided that G-Communications would utilize a letter of credit as its payment method. (*See* Pl.'s Interrogs. Resp. at 2.) Believing the financing issue was resolved, G-Communications subsequently placed several more purchase orders with CLT. (*See id.*)

On July 12, 1995, however, G-Communications informed CLT that it was experiencing difficulties obtaining a letter of credit. (*See id.* at 3.) On July 21, 1995, Chu met with Smarius and determined that CLT would issue net sixty day terms to G-Communications provided that a factoring company collected any payments to G-Communications from the third-party purchaser and transferred a percentage of the money collected into a CLT account. (*See* Chu Dep. 3/13/98 at 38-39.) Based on this agreement, on August 1, 1995, CLT shipped products valued at $319,628.80 to G-Communications pursuant to its previous orders. (*See* Defs.' Statement of Material Facts Not in Dispute ¶ 2 [hereinafter "Defs.' Stat."].)

In a letter dated September 6, 1995, Romie K. Sidabras ("Sidabras"), the Executive Vice President of G-Communications, alerted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 3
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

Chu of his plan to induce Colonial to invest money into G-Communications. (*See* Letter from Sidabras to Chu of 9/6/95, at 1.) Before receiving Sidabras's letter, CLT had never heard of Colonial. (*See* Defs.' Stat. ¶ 5.) On several occasions prior to September 6, 1995, G-Communications had also attempted to persuade CLT to invest money into G-Communications. (*See* Pl.'s Statement of Material Facts Not in Dispute ¶ 3 [hereinafter "Pl.'s Stat."]; Chu Dep. 3/13/98 at 103.)

*3 On September 12, 1995, Smarius, Chu and Fiederowicz met in Los Angeles, California at the offices of G-Communications. (*See* Chu Dep. 3/13/98 at 95-96; Defs.' Stat. ¶ 6; Fiederowicz Decl. ¶¶ 6, 9.) During this meeting, the parties discussed Colonial's possible investment in G-Communications. (*See* Defs.' Stat. ¶ 6; Chu Dep. 3/13/98 at 97-98.) At this meeting, Chu informed Fiederowicz that CLT had entered into an exclusive marketing agreement with G-Communications and that it would continue to honor that agreement no matter who actually owned G-Communications. (*See* Chu Dep. 3/13/98 at 96, 98.)

In an asset purchase agreement dated November 1, 1995, newly formed G-Tel Corporation ("G-Tel") purchased the assets and liabilities of G-Communications for $100,000. (*See* Giamalis Aff. Ex. 1 at 1-2.) G-Tel incorporated in Delaware and maintained its principal place of business in New Milford, Connecticut. (*See id.* Ex. 1 at 1.) Sidabras was named the Executive vice-president of G-Tel and Smarius was appointed President. (*See* Chu Aff. ¶ 18.)

In a November 22, 1995 letter, drafted on Colonial letterhead, Fiederowicz invited CLT to invest $150,000 in order to obtain a

ten percent equity interest in G-Tel, Colonial's "new subsidiary." (*See* Letter from Fiederowicz to Chu of 11/22/95.) George Tang, the President of CLT, accepted Colonial's offer to participate as an equity investor in G-Tel, (*see* Letter from Tang to Fiederowicz of 11/28/95), and designated Chu to negotiate an investment amount. (*See* Letter from Tang to Giamalis of 11/30/95.) On December 6, 1995, Chu, on behalf of CLT, signed a subscription agreement with G-Tel agreeing to purchase ten percent of G-Tel's issued and outstanding common stock for $100,000. (*See* Giamalis Aff. Ex. 3.)

As a result of CLT's investment, Colonial retained control of ninety percent of G-Tel's common stock. (*See* Smarius Dep. at 203 .) In an agreement signed on December 6, 1995, Colonial also confirmed that, "in its sole discretion," it would make available to G-Tel

certain financial support, which may include a line of credit or letters of credit or such other forms of support (the "Credit Support") as [Colonial] may determine for the purpose of pursuing all acquisition and investment opportunities with respect to the development and acquisition of new products by [G-Tel] and the distribution and sale of such new products. So long as the Credit support is not canceled ... such Credit Support shall be available ... in an amount not to exceed $300,000.

(*See* Giamalis Aff. Ex. 2.) Colonial also agreed that it would provide administrative support to G-Tel. (*See* Defs.' Stat. ¶ 13.) Colonial, however, did not assume any existing debts or liabilities of either G-Communications or G-Tel. (*See id.* ¶ 10; Pl.'s Stat. ¶ 10.) Colonial's investment into G-Tel benefitted G-Communications and improved the company's financial prospects. (*See* Defs.' Stat. ¶ 15.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
(Cite as: 1999 WL 200700 (D.Conn.))

Page 4

*4 During the course of its relationship with G-Tel, Colonial provided administrative support, performed G-Tel's bookkeeping, accounting and payroll functions, and paid all G-Tel salary and leasing expenses. (*See* Defs.' Stat. 18.) Colonial also made cash advances to G-Tel for the payment of other G-Tel expenses. (*See id* . ¶ 19.) Notwithstanding Colonial's financial support, G-Tel failed to achieve significant sales revenues and the company never became profitable. (*See id.* ¶¶ 20-21.)

In April 1996, Colonial discovered certain financial improprieties at G-Tel's California location where Sidabras and Smarius were located. (*See* Defs.' Stat. ¶ 22.) On May 4, 1996, Giamalis alerted Chu that Sidabras allegedly misused the G-Tel company credit card for personal items. (*See* Chu Dep. 3/13/98 at 148; Chu Aff. Ex. H.) Giamalis further informed Chu that Smarius had mismanaged Sidabras and that both Smarius and Sidabras should be removed from G-Tel's board of directors. (*See* Chu Dep. 3/13/98 at 148.) After speaking with Chu, Giamalis faxed a proposed consent removing Smarius and Sidabras from their positions on G-Tel's board. (*See* Chu Aff. Ex. H.) Chu signed this document and immediately faxed it back to Giamalis. (*See id.;* Chu Dep. 3/13/98 at 149.)

On May 6, 1996, at the request of Giamalis, Smarius and Sidabras arrived in Connecticut for a meeting at Colonial. (*See* Smarius Dep. at 79, 82, 84.) At this meeting, Smarius received a letter from Giamalis which provided: "You are hereby notified that your employment with G-Tel ... is terminated for cause, effective immediately." (*See* Letter from Giamalis to Smarius of 5/6/96.) Smarius was also served with a state court complaint alleging breach of contract, fraud,

negligent misrepresentation, breach of fiduciary duty, and breach of the duty of loyalty. (*See* Chu Aff. Ex. J.)

During the course of the May 6, 1996 meeting, Colonial sold its G-Tel shares back to Smarius for the nominal consideration of $1.00 and received a note from Smarius for $130,000 in outstanding loans made by Colonial to G-Tel. [FN1] (*See* Defs.' Stat. ¶ 24.) Colonial and Smarius also executed mutual releases related to all claims involving G-Tel. (*See* Defs.' Mem. of Law in Supp. of Defs .' Mot. for Summ. J. Ex. K [hereinafter "Defs.' Mem.].) Finally, Colonial agreed to pay, and did pay, all G-Tel salaries for an additional ninety days. (*See* Defs.' Stat. ¶ 26; Pl.'s Stat. ¶ 26.) Smarius subsequently decided to close down G-Tel. (*See* Defs.' Stat. ¶ 29; Pl.'s Stat. ¶ 29.)

> FN1. Colonial never received payment on this note and has since written it off in its entirety. (*See* Defs.' Stat. ¶ 25.)

On June 10, 1996, CLT commenced this action in the Central District of California. It was subsequently transferred to the District of Connecticut on November 18, 1996.

DISCUSSION
I. *Count One--Breach of Contract*

In Count One of the complaint, CLT contends that it invested $100,000 into G-Tel as a result of Colonial's oral representation that it would both manage G-Tel and provide the company with the necessary financial support to fulfill G-Tel's business plan. CLT contends that Colonial breached this oral agreement when Colonial sold back its shares in G-Tel to Smarius and stopped financing G-Tel.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

Page 5

*5 "A contract is formed when there is an offer and acceptance based on a mutual understanding between the parties." *L.G. Defelice, Inc. v. Fireman's Ins. Co.,* No. 3:97cv18(PCD), 1998 WL 910167, at *4 (D.Conn. Sept. 21, 1998) (citation omitted). Under Connecticut law, in order for a contract to be enforceable the agreement " 'must be definite and certain as to its terms and requirements." ' *Dunham v. Dunham,* 204 Conn. 303, 313 (1987) (quoting *Augeri v. C.F. Wooding Co.,* 173 Conn. 426, 429-30 (1977)), *overruled on other grounds by Santopietro v. New Haven,* 239 Conn. 207 (1996). This requirement is not unique to Connecticut contract law. In fact, when interpreting New York law, the Second Circuit has recognized "that, before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained .... Thus, definiteness as to material matters is of the very essence in contract law." *Ohanian v. Avis Rent A Car Sys., Inc.,* 779 F.2d 101, 109 (2d Cir.1985) (citation and internal quotation marks omitted). Where the essential terms of an agreement are either unclear or omitted, the contract must fail because judicial interpretation of the contract is not possible. *See Brookhaven Hous. Coalition v. Solomon,* 583 F.2d 584, 593 (2d Cir.1978); *see also L.G. Defelice, Inc.,* 1998 WL 910167, at *11 n. 15 (recognizing that "terms are reasonably certain when they provide a basis for determining the existence of a breach and giving the appropriate remedy") (citation omitted).

Here, Chu contends that on September 12, 1995, Fiederowicz stated that "if the deal goes through [Colonial] will provide necessary capital and credit so that G-Tel can act like a normal company." [FN2]

(Chu Dep. 3/13/98 at 164.) CLT further asserts that Colonial agreed to "manage" G-Tel. (*See id.* at 162.) Colonial argues that these alleged statements are insufficient to give rise to an oral contract. The court agrees.

> FN2. Chu's affidavit submitted in opposition to the defendants' motion for summary judgment contradicts his deposition testimony in that his affidavit represents that Colonial agreed to provide *all* capital and credit necessary for G-Tel to fulfill its business plan. (*See* Chu Aff. ¶ ¶ 8, 17) (emphasis added). The Second Circuit has recognized that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996). Thus, to the extent that Chu's affidavit contradicts his deposition testimony, the latter must be accepted.

Even assuming that Fiederowicz made these statements to Chu, these comments are too indefinite to establish an agreement between Colonial and CLT. During his deposition, Chu conceded that no understanding was reached between Colonial and CLT concerning either the amount of support Colonial was obligated to provide or the length of time such support must be maintained. His testimony provides, in pertinent part:

Q[:] Okay. Did Mr. Fiederowicz or Mr. Giamalis tell you how long Colonial would provide capital and credit to G-tel?
A[:] No, not how long, not how much.
(Chu Dep. 3/13/98 at 165.) Both of these

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

Page 6

terms are essential to this agreement and Chu's admission undermines CLT's breach of contract claim. *See Myers v. Bunker Ramo Corp.*, Civ. No. B-90-506(JAC), 1992 WL 88166, at *3 (D.Conn. Jan. 21, 1992) (finding no oral employment contract where the conversations between the plaintiff and the defendant demonstrated that "there was no actual agreement on any terms"), *aff'd*, 979 F.2d 846 (2d Cir.1992). Chu also admits that the parties did not have an understanding about what actions Colonial was obligated to take in order to "manage" G-Tel. (*See* Chu Dep. 3/13/98 at 163.) Given Chu's testimony, the record is devoid of any evidence that the parties actually discussed or agreed upon any of the terms of this alleged oral contract. Furthermore, CLT presents no evidence that Colonial invited them to invest in G-Tel on September 12, 1995. Without such a showing, the court cannot find that an offer was even made to CLT at the time Fiederowicz allegedly made these statements to Chu. Therefore, summary judgment is warranted on this claim. [FN3]

FN3. Chu's affidavit also provides that "[i]n phone conversations with Mr. Giamalis after CLT's purchase of the stock, Mr. Giamalis again reiterated to me that Colonial Data would provide all the capital and credit necessary for G-Tel to fulfill its business plan." (Chu.Aff.¶ 17.) It is well established that an executory promise is unenforceable in the absence of consideration. *See Gianetti v. Norwalk Hosp.*, 211 Conn. 51, 61 (1989), *State Nat'l Bank v. Dick*, 164 Conn. 523, 529 (1973); *Osborne v. Locke Steel Chain Co.*, 153 Conn. 527, 531 (1966). "Consideration consists of a benefit to the party promising, or a

loss or detriment to the party to whom the promise is made." *Gianetti*, 211 Conn. at 61. Given that CLT had already invested in G-Tel at this point in time, this alleged promise lacks consideration. Thus, this statement does not provide a basis for CLT's breach of contract claim.

II. *Counts Two and Three--Intentional and Negligent Misrepresentation* [FN4]

FN4. The court notes that CLT makes no argument in opposition to Colonial's request for summary judgment on both Counts Two and Three. Under our Local Rules the "[f]ailure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion, except where the pleadings provide sufficient grounds to deny the motion." D. Conn. L. Civ. R. 9(a). CLT's decision not to address Colonial's arguments with respect to both of these counts provides a valid basis for granting summary judgment in favor of the defendants as to both of these counts. Although the court could properly rely on this basis alone in granting summary judgment, the court will address the merits of CLT's claims for the purpose of completeness.

**\*6** Counts Two and Three are the only two claims directed against defendants Fiederowicz and Giamalis. In Count Two, CLT contends that it invested in G-Tel in reliance on the defendants' representations that it was committed to managing G-Tel and financing G-Tel's business plan. CLT asserts that when the defendants made these representations, they knew them to be false.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In order to state a claim for intentional/fraudulent misrepresentation, a plaintiff must establish four essential elements: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller v. Appleby,* 183 Conn. 51, 54-55 (1981) (citations omitted).

CLT's claim for intentional misrepresentation fails because there is no evidence in the record that either Fiederowicz or Giamalis made any false statements of fact. Chu acknowledged this fact at his deposition. The relevant testimony provides:

> Q[:] In your view what statements did Mr. Fiederowicz or Mr. Giamalis make to you before you agreed to invest that were false? What did they say that was false?
> A[:] That were false or that were never fulfilled?
> Q[:] Well, that were not true, at the time they said them that were not true?
> A[:] No---
> Q[:] Do you think that they lied to you?
> A[:] No, I don't think they lied to me. I don't think they lied to me at all. I just think or know that certain promise was not fulfilled at a later date.

(Chu Dep. 3/13/98 at 169.) Given this concession, CLT cannot establish the second element of its intentional misrepresentation claim. *Cf. Murray v. Xerox Corp.,* 811 F.2d 118, 121 (2d Cir.1987) (interpreting New York law and finding that "a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promises at the time it is made") (citation omitted). Thus, this claim fails as a matter of law. *See Celotex,* 477 U.S. at 323

(finding that summary judgment is appropriate if the nonmovant "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof").

In Count Three of the complaint, CLT raises a claim for negligent misrepresentation and asserts that the defendants made certain representations although "they had no reasonable grounds for believing the representations to be true." (Compl.¶ 25.) Chu's deposition testimony undercuts the validity of this claim.

A cause of action for negligent misrepresentation under Connecticut law is consistent with the standard articulated by the Restatement (Second) of Torts which provides that:

> One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

*\*7 Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 575 (1995) (quoting Restatement (Second) of Torts § 552 (1977)). Intent need not be demonstrated to make out a cause of action for negligent misrepresentation. *See id.; see also Foy v. Pratt & Whitney Group,* 127 F.3d 229, 233 (2d Cir.1997). Thus, to establish such a claim a plaintiff must demonstrate that (1) the defendant made a misrepresentation; (2) the defendant knew, or reasonably should have known that the statement was untrue; and (3) the plaintiff's reliance on the misrepresentation was both justifiable and detrimental. *See Foy,* 127 F.3d at 233.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
(Cite as: 1999 WL 200700 (D.Conn.))

Page 8

Here, Chu admits that neither Fiederowicz's nor Giamalis's statements were false at the time they were made. (*See* Chu Dep. 3/13/98 at 169.) Without such evidence, CLT cannot establish either the first or second element of its negligent misrepresentation claim.

Accordingly, the defendants are entitled to summary judgment on both Counts Two and Three.

### III. *Count Four--Breach of Fiduciary Duty*

In Count Four of the complaint, CLT contends that Colonial, as the majority shareholder in G-Tel, owed CLT a fiduciary duty not to use its majority position to benefit itself and harm CLT. CLT argues that Colonial breached this duty when it sold its shares back to Smarius

> (a) without notice to [CLT], (b) with knowledge of [CLT's] reliance on Colonial's continued involvement in G-Tel; (c) with knowledge that as a result of Colonial's conduct, [CLT] would thereafter hold a minority interest in a company controlled by someone that Colonial believed was guilty of fraud and violations of fiduciary duties; and, (d) with knowledge that without Colonial's promised participation, [CLT's] interest in G-Tel was valueless.

(Compl.¶ 28.) Colonial argues that it is entitled to summary judgment on this claim because it has no fiduciary duty not to sell its shares. Moreover, Colonial contends that, even if a duty existed, there is no evidence that it breached this duty or that CLT suffered damages from this breach. Because CLT has not presented any evidence that it was damaged by Colonial's actions, the court finds that Colonial is entitled to summary judgment on this claim.

### A. *Choice of Law*

The parties initially dispute which state's law controls CLT's breach of fiduciary duty claim. CLT argues that because G-Tel is a Delaware corporation, the court must apply Delaware law to this issue. However, neither case relied upon by CLT supports this proposition. *See RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326 (2d Cir.1991) (recognizing only that "[j]udicial review of a corporate decision to bring, not to bring, or to terminate a lawsuit is in turn governed by the business judgment rule, as determined by the law of the state of incorporation"); *Dynamics Corp. v. WHX Corp.,* 967 F.Supp. 59, 64 (D.Conn.1997) (noting that decisions of a corporation's board of directors must be reviewed under the law of the state of incorporation).

**\*8** Colonial correctly contends that the court must follow Connecticut choice of law rules in deciding this question. *See Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989) (stating that a "federal court sitting in diversity ... must apply the choice of law rules of the forum state") (citation omitted). Because a breach of fiduciary duty claim sounds in tort, *see Meredith v. Rippeto,* Civ. No. B-87-500(WWE), 1991 U.S. Dist. LEXIS 14793, at *7 (D.Conn. Aug. 26, 1991), the choice of law depends on Connecticut's conflict rules for torts.

Connecticut has traditionally followed the doctrine of lex loci delicti which "presumes that the rights and obligations of the parties to a tort action 'vest' at the place of the injury." *O'Connor v. O'Connor,* 201 Conn. 632, 639 (1986) (citation omitted). However, rigid adherence to this doctrine is no longer encouraged where its strict application "frustrates the legitimate expectations of the parties and undermines an important policy of this state." *Id.* at 637.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

Page 9

In fact, the Connecticut Supreme Court has stated:

> We are, therefore, persuaded that the time has come for the law in this state to abandon categorical allegiance to the doctrine of lex loci delicti in tort actions. Lex loci has lost its theoretical underpinnings. Its formerly broad base of support has suffered erosion. We need not decide today, however, whether to discard lex loci in all its manifestations. It is sufficient for us to consider whether, in the circumstances of the present case, reason and justice require the relaxation of its stringent insistence on determining conflicts of laws solely by reference to the place where a tort occurred.

*Id.* at 648. Thus, the Connecticut Supreme Court has found that where application of lex loci "would produce an arbitrary [or] irrational result," the guidelines of the Restatement Second of Conflict of Laws should be considered. *Id.* at 650; *see also Northern Tankers (Cyprus) Ltd. v. Backstrom,* 934 F.Supp. 33, 38 (D.Conn.1996).

This is not a case where the application of the lex loci doctrine results in either an arbitrary or irrational outcome. Connecticut, not Delaware, has the most relevant contacts to this controversy. In fact, Delaware has no relation to this case beyond the mere fact that G-Tel is a Delaware corporation. Connecticut, on the other hand, is where Colonial's principle place of business is located. More importantly, the meeting where Colonial allegedly breached its fiduciary duty to CLT was held at Colonial's facility in New Milford, Connecticut. Given these factors, neither party should be surprised by the application of Connecticut law. Moreover, CLT makes no showing that the application of Connecticut law interferes with the legitimate expectations of the

parties or undermines an important policy of Connecticut. In the absence of such a showing, the court must apply Connecticut law to CLT's breach of fiduciary duty claim.

B. *The Scope of Colonial's Fiduciary Duty*

**\*9** Generally, "[a] majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests." *United States v. Byrum,* 408 U.S. 125, 137 (1972). A violation of such a duty may occur when a majority shareholder sells his stock and transfers his control "where he knows or has reason to know that the purchaser intends to loot or mismanage the corporation or otherwise injure its shareholders." *Treadway Co., Inc. v. Care Corp.,* 638 F.2d 357, 377 n. 38 (2d Cir.1980) (citation omitted); *Banks v. Vito,* 19 Conn.App. 256, 262 (1989) (recognizing that a breach of fiduciary duty occurs "[i]f the controlling majority stockholder seeks to injure the minority stockholder through the means of looting the corporation or so wrecking it that the minority stockholder would get nothing out of his assets") (citation omitted); *accord Harris v. Carter,* 582 A .2d 222, 235 (Del. Ch.1990) (finding that "while a person who transfers corporate control to another is surely not a surety for his buyer, when the circumstances would alert a reasonably prudent person to a risk that his buyer is dishonest or in some material respect not truthful, a duty devolves upon the seller to make such inquiry as a reasonably prudent person would make, and generally to exercise care so that others who will be affected by his actions should not be injured by wrongful conduct").

CLT claims that Colonial breached its fiduciary duty by selling its controlling interest in G-Tel to Smarius, an individual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 200700 (D.Conn.)
**(Cite as: 1999 WL 200700 (D.Conn.))**

who Colonial was prepared to file a state court action against sounding in breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty, and breach of the duty of loyalty. (*See* Chu Aff. Ex. J.) While the court questions the appropriateness of such a sale, CLT has presented no evidence that it was injured as a result of this transfer of control. There is no information that Smarius either engaged in self-dealing or mismanaged G-Tel upon gaining control of the corporation. Rather, Smarius decided to close down a business that both parties conceded was never profitable. (*See* Defs.' Stat. ¶ 20.) While such a decision may have put an end to CLT's hopes that G-Tel would eventually become a good investment, it did not alter the present worth of CLT's shares in G-Tel.

There is also no evidence in the record that Colonial benefitted from its sale of its stock to Smarius. *See Byrum,* 408 U.S. at 137 (recognizing that a majority shareholder breaches his fiduciary duty if he uses his ability to control a corporation to his own benefit and to the detriment of the minority shareholder). In fact, it is clear that Colonial lost money. Their ninety percent interest in G-Tel was sold to Smarius for $1.00. Moreover, the $130,000 note Colonial received merely memorialized a preexisting debt owed by G-Tel to Colonial under the Credit Support agreement and Colonial never even received payment of this debt. Finally, the court finds the fact that Smarius and Colonial executed mutual releases from all future claims of limited significance. [FN5]

> FN5. CLT also argues that Colonial breached its fiduciary duty by failing to continue to provide financial support to G-Tel. The court rejects CLT's position that a majority shareholder must continue to pour capital into a company that it no longer considers a sound investment. Such a claim is illogical and contradicts the clear language of the Credit Support agreement which allowed Colonial to provide credit to G-Tel in Colonial's sole discretion. Thus, CLT's position is without merit.

**\*10** Accordingly, Colonial is entitled to summary judgment on this claim.

### CONCLUSION
Based on the foregoing analysis, the defendants' Motion for Summary Judgment [doc. # 46] is GRANTED. The Clerk is directed to close this case.

1999 WL 200700 (D.Conn.)

**Motions, Pleadings and Filings (Back to top)**

.        3:96CV02490        (Docket) (Nov. 25, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.