# EXHIBIT B

# Executive Adjustment Services, LLC

23 CANTERBURY DRIVE
DURHAM, CT 06422



PHONE/FAX (860) 349-8028    ~    Email – executive.service@snet.net    ~    Cell Phone (203) 410-4542

*Licensed Public Adjusters in CT & FL*

## VALUE DETERMINATION OPINIONS

### ATIAS v. PATRONS MUTUAL INSURANCE COMPANY OF CONNECTICUT

I, Louis E. Ranciato, have been retained by Joseph and Haim Atias to render an opinion relative to the above mentioned matter. The question posed for review; *Does Patrons owe the policy limits in a total loss situation on this particular building under the contract of insurance?*

After reviewing the policy and circumstances, I respectfully offer the following opinions and comments for consideration by the parties.

Patrons Mutual Insurance Company of Connecticut, hereinafter referred to as Patrons, issued a Contract of Insurance, hereinafter referred to as the policy, to Joseph and Haim Atias for coverage on the insured building in the amount of **$200,000.00**. The policy provided **Replacement Cost(RC)** coverage for the insured building located at 475 New Britain Avenue, Hartford, CT 06106. Patrons collected a premium commensurate with the amount of coverage provided under the policy. The policy also provided for $20,000.00 for Additional Expense and Loss of Rents coverage. Subsequent to issuance of the policy; the insured building was completely destroyed by fire. Both parties agreed the building was a total loss and had to be razed.

## THE POLICY LANGUAGE AND LOSS SETTLEMENT TERMS

The policy contains language reflecting that Patrons contemplated coverage for **Physical Replacement Cost(RC)** of the covered building. This is supported by policy language which consistently refers to "**direct physical loss**" and "**damage**" throughout. Further; the carrier charged premiums commensurate with the physical values of the insured property.

The policy contains language for "**Loss Settlement Terms**" in which the carrier agrees they will "..*pay the lesser of:*

    a)    *the limit that applies;*

    b)    *your interest in the property; or*

    c)    *the amount determined under the Replacement Cost Terms or the Actual Cash Value Terms, whichever apply."*

*" We Make A Difference "*

As to **Subsection a)**; in addition to the limit of liability of $200,000.00, the policy also provides for an additional 5% for debris removal if the policy limit is exceeded.

As to **Subsection b)**; The policyholders have already been determined to be the owners of the insured property. Therefore; their interest would be 100% of the amounts as determined under **Subsections a) or c)**.

It has also been determined that the carrier has not been forthcoming with the limit of liability in payment of the claim under **Subsection a)**, therefore; that leaves **Subsection "c)"** as the determining factor for the amount of the claim payment.

The Loss Settlement Terms; specifically outline the **"Replacement Cost Terms"** and the **"Actual Cash Value Terms"** contemplated by the carrier in settlement of claims under the policy. The Replacement Cost Terms *"...apply only to buildings under coverage A and B that have a permanent foundation and roof"* It was determined that the building in question falls under this category and would be covered under the Replacement Cost Terms.

It is my contention the policy contains overriding language which precludes utilizing ACV as the basis for settlement under the circumstances. However; I will address the issue of ACV simply because the carrier has proffered an offer on that basis. The ACV review will address issues related to ambiguity, interpretation, and correct methodologies to be used in determining values pursuant to the policy. My comments will also refer to carriers, in general, because of my strong feeling that this matter is not an isolated incident, but rather an ongoing business practice on the part of many carriers affecting consumers as a class.

## ACTUAL CASH VALUE

The Actual Cash Value Terms of the policy reveal that the carrier contemplated, *"...a deduction for depreciation, however caused"* to arrive at ACV. Further; the carrier agrees, *"The smallest of the following amounts is used in applying the Loss Settlement Terms:*

1) *the cost to repair or replace the property with materials of like kind and quality to the extent practical;*

2) *the actual cash value of the property at the time of loss; or*

3) *(applies only to mobile homes) the difference in the actual cash value just before the loss and the actual cash value just after the loss."*

The subject property is not a mobile home, therefore **Subsection 3)** is eliminated. This leaves the smaller of **Subsections 1) or 2)** as the method of payment under the ACV section. Although this language would appear to be reasonably clear; Patrons has apparently opted to utilize the **Broad Evidence Rule** as their criteria to arrive at ACV.

The term Actual Cash Value has been the source of never ending consternation to adjusters for years.

*" We Make A Difference "*

Carriers have been citing cases from as far back as 1928 and more recently 1975, in support of their attempts to utilize The Broad Evidence approach to adjusting claims involving ACV losses. The carrier's actions would be better accepted if they modified their policies to accommodate the case law they continue to cite in support of lower values when settling claims. The fact is that the contract of insurance in this matter was proffered well after these cited cases have been resolved, and with the full understanding that the term **Actual Cash Value is ambiguous on it's face.**

At best; the carrier's position would have to contend that there is more than one interpretation to be drawn from the language of the policy when it refers to **Actual Cash Value**. This position would therefore make the term ambiguous on it's face. Ordinarily; **a word or phrase is ambiguous when it is capable of more than a single meaning** when viewed objectively, by a reasonably intelligent person who has examined the context of the entire integrated agreement, and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. It is patently unfair for an adjuster to seize a value predicated on an interpretation which is only to the financial benefit of the carrier. In fact; this would be **Bad Faith.**

Paramount consideration has to be given to the fact that the insurance policy is a **Contract of Adhesion**, proffered by the carrier. Policyholders never have the benefit of normal bargaining as to the terms, language, or conditions of the insurance transaction. Typically; these are, take it or leave it, transactions for the policyholders. Consequently; any ambiguities or shaded areas are always construed most strongly against the party whose words are used, ....that being the carrier in this case. These determinations are made under the principle of **"contra proferentem"** and are based upon the superior bargaining position enjoyed by the carriers in negotiating the insurance contract. The carrier certainly had every opportunity to provide for more definitive, or restrictive language, within the policy or the endorsements thereto. The carrier could've easily included language which would've provided a reasonable and prudent person to conclude they <u>would</u> use the **Broad Evidence Rule** to settle claims, especially since this is in direct contradiction to the manner in which the policy is marketed and sold.

Very often, carriers utilize the services of Real Estate appraisers <u>after</u> a loss occurs. It is significant that this is never done when the insurance is placed by the carrier. The real estate appraisal reports don't adequately resolve the obvious disparity between **real estate practices versus insurance practices** relating to determinations of value. In particular; many of the appraisers don't even develop a value for replacement of the building with like kind and quality, or an income producing value. Carriers bear a requirement of good faith dealing to seek out these types of inconsistencies and resolve them fairly.

Many carriers use these real estate appraisal reports to support lower offers of settlement to policyholders, citing them as reports from independent appraisers. The problem is; the carriers are the knowledgeable parties to the insurance transactions and the ongoing disputes related to use of the Broad Evidence Approach to value. When the assignment is given to the real estate appraisers, there is an inherent responsibility to bring this to the attention of the appraisers, so the missing variables as to value can be developed properly. Unfortunately; some carriers seem to go back to the same appraisers over, and over again, leading to the suspicion that the appraisers might fall under the category of **"Captive Vendors"**, rather than truly independent appraisers.

The mere fact that it has been necessary to look to the courts so many times for interpretation of ACV should provide **prima facie evidence that the term is ambiguous.** Carriers know this and choose

*" We Make A Difference "*

to ignore it because it is convenient and profitable for them. If the carriers truly wanted a fair resolution of the ambiguity, they could simply incorporate a **definition of actual cash value** in their policy. Only a few carriers have taken steps to start using endorsements which give a detailed definition of Actual Cash Value to avoid this problem. Unfortunately for consumers; it is to most carrier's benefit to maintain the ambiguity and not have resolution of these issues with certainty. This allows them to continue marketing the insurance at the higher values and settling claims at the lower values.

Also in support of my argument as to ambiguity; I have numerous building estimates from insurance carriers and their adjusters, doing business in the State of Connecticut, which clearly depict <u>Actual Cash Value as Physical Replacement Cost less Physical Depreciation.</u> These reports span a period of time from 1980 up to present. Patrons is among those carriers utilizing this definition and methodology of settling ACV claims. These reports are available for inspection by the parties to this claim if so desired.

One should also review any existing underwriting reports related to the insured property. I feel this information is germane to the task of determining the carrier's own set of mind with regard to the value of the property. If the Broad Evidence Rule were to be used; the policyholder is entitled to any information which would logically tend to the formation of a correct value of the property. **Wouldn't the carrier's own opinion of value before the loss be important to consider?** These reports should be provided forthwith and without objection.

It is my understanding that both Patrons and the policyholders have agreed that the current RC of the insured building is in excess of $400,000.00. Insurance adjusters normally use trade summaries to determine the physical depreciation attributable to a given building. This is necessary because trades such as cleaning, demolition, permits, architectural fees, etc. are non-depreciable items. Further; some trade items such as rough framing, insulation, and foundations depreciate minimally, as opposed to items such as paint and decorating.

It should be noted that it is considered an unfair practice to take overall depreciation on property losses. Recognizing this; I wouldn't take an overall depreciation on any loss because it is deceiving. For purposes of demonstration I will utilize an overall high depreciation to the RC of $400,000.00 mentioned above. Applying a 1/3 depreciation would still leave an ACV of $266,666.66. Again; this 1/3 would in fact extrapolate to approximately 50%, given the non-depreciable items and the minimally depreciable items which are included in the overall depreciation amount. Bottom line is the ACV which would still be far in excess of the limit of Liability of $200,000.00.

As indicated above and for reasons stated hereafter; I don't think it is appropriate to settle the claim on an ACV basis. That being said; even if payment were to be made on an ACV basis, it should then be $200,000.00 plus an additional $10,000.00 which represents Five Percent(5%) of Coverage A.

<u>**ACV amount due would be $210,000.00**</u>

*" We Make A Difference "*

# REPLACEMENT COST VALUES

The Replacement Cost Terms language is adequately clear and provides for payment under two relevant circumstances. The first being, *"If the limit on the damaged building is less than 80 percent of its replacement cost at the time of loss..."* and the other being, *"...If the limit on the damaged building is at least 80 percent of its replacement cost at the time of loss..."*

## VALUE WHEN BUILDING IS INSURED TO AT LEAST 80 PERCENT OF REPLACEMENT COST

This case assumes the building is insured to value correctly and the carrier agrees, *"...the smaller.."* of the following amounts is used in applying the Loss Settlement Terms:

1) the cost to repair or replace the damage on the same premises using materials of like and quality, to the extent practical; or

2) the amount spent to repair or replace the damage.

At first blush; one would think that both Subsections 1) & 2) are the same. However; it is clear that the building **wasn't** insured to value and neither of these would apply. Moreover; even if it did apply, the language in Subsection 1) makes a clear distinction by specifying that the repair or replacement must be *"...on the same premises"* On that basis; it could be reasonably argued that the carrier has agreed to give the policyholders the option to repair or replace the damage elsewhere.

## VALUE WHEN BUILDING IS INSURED TO LESS THAN 80 PERCENT OF REPLACEMENT COST

This case assumes the building is underinsured and the carrier agrees, *"...the larger.."* of the following amounts is used in applying the Loss Settlement Terms:

1) The actual cash value at the time of loss; or

2) that part of the replacement cost of the damaged part which our limit on the building bears to 80 percent of the full current replacement cost of the building.

Again; the carrier makes clear distinctions between ACV and the value proffered in Subsection 2), and agrees they will pay the **larger** of the two if the building is not insured to value. As indicated above; the building was **not** insured to value so the carrier would owe the larger of the two under this section.

Carriers usually refer to the value in Subsection 2) as a "Coinsurance Formula." Patrons did not refer to it by that name, but the effect is still the same. The measure of recovery would be applied as outlined below.

*" We Make A Difference "*

Utilizing the replacement cost of $400,000.00 as stated above; I applied the policy language and determined the amount of insurance required and the coinsurance percentage as follows:

**Replacement Cost Required**     $400,000.00 x 80 % = **320,000.00 is The Amount of Insurance**

Amount of insurance carried was $200,000.00 divided by $320,000.00 = **62.50% as the Coinsurance Formula applicable to the loss**

As outlined in Subsection 2); this percentage is to be applied to the full replacement cost of the building as follows:

Full Replacement Cost = $400,000.00 x 62.50% = **$250,000.00 is the Amount determined to be due under Subsection 2)**

Recalling that the introductory language under the Loss Settlement Terms limit the amount the carrier will owe to the lesser of the amounts determined under **Subsections a), b), or c)**, the policyholders cannot reasonably expect the carrier to pay the $250,000.00 amount. Both the ACV and RC exceed the policy limit, hence; the lesser of the three options would have to be the *"...limit that applies.."* The amount due under the Replacement Cost Terms would also be the policy limit of $200,000.00 plus an additional $10,000.00 which represents Five Percent(5%) of Coverage A.

**RC amount due would be $210,000.00**

## LOST RENTS

It is my understanding there were three(3) apartments in the insured building with a Fair Rental Value of $1,000.00 each. In that the building had to be taken down; one would think that the carrier would've been forthcoming with the policy limit of $20,000.00 immediately. The policy provided coverage for lost rentals during, *"...the period of time reasonably required to make that part of the insured premises rented or held for rentals to others fit for use."*

The policyholders anticipated a Gross Fair Rental Income of $36,000.00 per year, which would have to be reduced by, *"...charges and expenses that do not continue while the insured premises is unfit for use."* The period of coverage is not limited by the policy period. The carrier did not provide the necessary insurance proceeds to repair or replace the building in a timely manner. The amount of lost rental would have exceeded the policy limit of $20,000.00 in any event. The question now remains whether the carrier should be held accountable for the additional lost rents since the date of loss because of the delay in payment for the claim. If so; the Gross Fair Rental Loss would have to be calculated for the period of time from the Date of Loss to present. As of September 1, 2005; this was thirty-two(32) months. The Gross Fair Rental Amount during this time would be $96,000.00. Of course; this would have to be reduced by the discontinuing expenses as indicated above.

**Fair Rental Loss would be policy limit of $20,000.00***
*(see comments in conclusion relative to additional damages)*

*" We Make A Difference "*

## DISCUSSION OF THE FACTS

In response to the carrier's apparent position of settlement of the claim on an ACV basis, I would offer the following comments. The policy is clear on that issue. It specifically addresses that question under the **Replacement Cost Terms, Section d., Subsections 1) or 2)**. It makes unambiguous distinction in stating the carrier will pay the " **larger** " of the two amounts arrived at in those two subsections. One of those amounts is **Actual Cash Value**, and the other is that value which I developed using the coinsurance formula. This is very important because it resolves any questions as to how the claim should've been settled from the outset.

The carrier's utilization of a Real Estate appraiser is in direct contradiction to the terms and language of the policy. Use of real estate appraisal reports inevitably lead to delays and disparity in the claim amounts. The assumption is the carrier is trying to settle the claim on the basis of the real estate value, as opposed to the insurance values outlined in the policy. Delays attributable to adjusting tactics outside of the four corners of the policy should not be tolerated. In many cases these tactics cause the policyholders to incur lost rental amounts, or consequential damages, far and above the limits of the policy. Carriers should be held accountable in the event of avoidable delays causing consumers to incur unnecessary expenses.

On the subject of policy limits; it should be pointed out that deductibles should be waived by the carriers if any of the coverage amounts exceed the limit of liability. In this case; there is a $2,500.00 deductible which should not be applied if the lost rents exceeded policy limits, or if the building claim exceeds policy limits.

Broad Evidence settlements very often leave consumers without sufficient funds to rebuild, or to re-establish vital cash flow which existed prior to the losses. Consumers have a reasonable expectation to receive settlements which put them back to the same financial condition they held before the losses. Deficient settlements are not true indemnification for the consumers.

## CONCLUSION

For all the reasons stated herein; I respectfully submit my expert opinion that Patron's owes the policy limits of **$210,000.00** building loss, and **$20,000.00** for Rental Loss. Further; the deductible should be waived because the damages exceeded the policy limits. As to any additional damages which might have occurred because of unnecessary delays in payment of the claim; these should be worked out between the parties.

I remain available to provide expert testimony relative to the opinions rendered herein.

Respectfully submitted


Louis E. Ranciato – LLC Member
Licensed Public Adjuster
Executive Adjustment Services, LLC

*" We Make A Difference "*